SAMUEL J. BERG *v.* CLARENCE M. PLITT
SAME *v.* H. KLAFF & COMPANY

[No. 18, 19, April Term, 1940.]

156

158

*Decided April 18th, 1940.*

*On motion for reargument, May 22nd, 1940.*

The cause was argued before BOND, C. J., OFFUTT, PARKE, SLOAN, MITCHELL, and DELAPLAINE, JJ.

*Randolph Barton, Jr.,* and *Daniel S. Sullivan, Jr.,* with whom was *Sidney B. Needle* on the brief, for the appellant.

*Edward L. Ward,* with whom were *Emanuel Gorfine* and *Irvin Davison* on the brief, for the appellees.

OFFUTT, J., delivered the opinion of the Court.

The trustee in bankruptcy of the Geiser Manufacturing Company gave notice by advertisement that the assets of the bankrupt, including real and personal property, would be sold at public auction on the premises at Waynesboro, Pennsylvania, on July 7th, 1938. Learning of the sale, a group of junk and scrap iron dealers formed a pool, and agreed among themselves that one member of the pool should bid on the personal property, that if he succeeded in buying it he would then offer his bargain at a private auction limited to members of the group, and that, if at that auction the bargain were sold at a higher price than that bid at the public auction, the excess would be divided equally among the group.

Among the members of the group were Samuel J. Berg, the appellant in this case, Joseph and Nathan Brenner, trading as Joseph Brenner & Son, Clarence Plitt, H. Klaff & Co., Incorporated, and Max Bailis, representing Max Bailis & Sons. Bailis at the public auction bought the machinery and personal property of the bankrupt, exclusive of "inventory and repair parts," for $40,300, and the trustee so reported the sale. After the sale the members of the group met in a hotel in Waynesboro, and the right which Bailis had secured of taking the property at $40,300, which for convenience is referred to as the bargain, was offered for sale to any member of the group who might bid for it.

Samuel J. Berg, trading as Berg Brothers Company, acting for himself, for Joseph Brenner & Son, and for H. Klaff & Co., Incorporated, was the highest bidder at $3300, and the bargain was sold to him for that price. Under an agreement between them, Berg, Klaff & Co., and Brenner & Son, each had a one-third interest in the bargain, and the Brenners and the Klaff Company each paid to Berg $2000 to reimburse him for a cash deposit of $6045 which he had paid to the trustee, and to Klaff

& Co., which acted as treasurer for the pool, the Brenners and Berg each paid $1100, which was one third of the amount bid at the private auction for the bargain. Subsequently the Brenners assigned their one third interest in the bargain to Clarence M. Plitt.

Through various mesne proceedings Berg, with the consent of the trustee, was substituted for Max Bailis as purchaser of the bankrupt's property.

Exceptions to the sale were overruled, and the sale to Berg, as substituted purchaser, finally ratified and confirmed, whereupon the trustee demanded that Berg complete the transaction by paying the balance of the purchase money and taking title to the property. After some delay the trustee peremptorily set the office of the bankrupt at Waynesboro, and January 31st, 1939, as the place and time for final settlement, and so notified Berg, the substituted purchaser, and he in turn notified Plitt and Klaff, and instructed them each to be present "prepared with certified check." Berg then telegraphed the trustee that he would be present to discuss matters preliminary to final action. At the place and time appointed Berg, Klaff, Louis M. Silberstein, attorney for Berg, Klaff and Plitt, the trustee, and Sidney B. Needle, an attorney representing Berg, were all present. The trustee tendered Berg a paper purporting to be a bill of sale for the property sold to him by the trustee, and demanded the balance due on the sale. Berg refused to complete the purchase, and thereafter the court ordered that the deposit be retained by the trustee as liquidated damages, and the property resold.

In connection with the litigation growing out of the exceptions to the trustee's sale, Plitt and Klaff deemed it expedient to employ an attorney to aid in securing a ratification of the sale to Berg, and they employed Louis M. Silberstein. Silberstein said that he was also employed by Berg, but Berg denied that, and it is undisputed that, while Plitt and Klaff each paid one third of his fee, Berg has paid him nothing.

After Berg had finally refused to complete his purchase at the bankrupt's sale, Plitt and Klaff & Co., Incorporated, brought these actions to recover from him the $2000 and the $1100 respectively which each of them had paid to him to reimburse him for the money which he had advanced for each of them for the cash deposit, and for the price paid to Klaff as treasurer for the pool for the purchase of Berg's interest in the bargain.

The trial of the case resulted in a verdict and judgment for the plaintiff in each case, for $3516.67 in Plitt's case, $3379.17 in Klaff & Co.'s case, and from those judgments these appeals were taken.

The judgment in the Plitt case included the $2000, the $1100, and one third of the attorney's fee, $416.67, and that in the Klaff case the same three items less $137.50, being the proportionate share of each member of the pool in the $3300 bonus which Klaff & Co. held as treasurer for the pool.

The record in each case submits fourteen exceptions, of which thirteen relate to questions of evidence and one to the rulings on the prayers.

Comprehension of the significance of these exceptions may be aided by a brief statement of the conflicting theories of the parties as to their respective rights under the several transactions from which these actions arise.

The plaintiffs contend that they and Berg, the appellant, entered into a valid agreement under which Berg bought from Brenner & Son the bankrupt's property for the joint account of all three, that each was to pay one third of the purchase price which Bailis & Sons had bid for it, and one third of the bonus which Berg had paid for the bargain, that they each paid Berg one third of the cash deposit required of him by the trustee, one third of the bonus which he had paid to the pool, and one third of the fees charged by the lawyer for his services rendered in opposing exceptions to the sale, that Berg as the substituted purchaser was alone authorized to complete the sale to him, that he wrongfully and without any valid excuse refused to complete, and that in consequence it

was vacated, that thereupon he became obliged to restore to them the money which they had paid him in reliance upon his undertaking to complete the sale, and to reimburse them for money paid for legal services in procuring the ratification of the sale to him.

The defendant on the other hand contends that the agreement between members of the pool that the bankrupt's property was to be bid in by one member for the account of the others tended to suppress bidding at the sale, was against public policy and void, and that any contract based on rights derived from that agreement fell with it, but that, apart from that, Berg did not wilfully or wrongfully refuse to complete the sale, that the bill of sale tendered him by the trustee was for less goods than he bought, and that he was justified in refusing to accept it, since he was under no obligation to go ahead with the sale and pay the balance of the purchase price unless and until the trustee tendered him a bill of sale for all the property which he bought, and he also contended that as he did not employ the lawyer he was not obliged to pay him.

The first six exceptions relate to the admission in evidence of testimony tending to prove that Berg had joined Plitt and Klaff in employing Silberstein as an attorney to represent them in defending the sale to Berg, that Plitt and Klaff each paid him one third of his fee of $1250, but that Berg had paid him nothing. These exceptions were not argued in this court, in the absence of any damage prayer are unimportant, and will be treated as abandoned. Rules of the Court of Appeals, Rule 37, sub-section 4.

In the course of the examination of Louis M. Silberstein, a witness for plaintiffs, he referred to the meeting at the bankrupt's office in Waynesboro on January 31st, 1939, and said that a discussion occurred there which "consumed * * * practically the whole afternoon." He was then asked on cross examination, "There was a lot of discussion there amongst the buyers as to what they had gotten and had not?" An objection to that question was

sustained. That ruling appears to be free from error. The so called question, embodied in the seventh exception, was in form a statement of fact and not a question at all. But apart from that, there is nothing in the statement to indicate that it referred to any transaction in which any party to these cases was interested.

The eight and ninth exceptions refer to the action of the court in admitting in evidence an order of the United States District Court of the Middle District of Pennsylvania, directing the trustee to retain as liquidated damages the sum of $6045 paid by Berg to him as a cash deposit on account of the sale. The order was unquestionably relevant to the issues in the case, and while it does not appear that the exhibit was properly authenticated, no objection to it was made on that ground, although the court suggested that it understood the objection went to its relevancy alone. Since the defendant made no reply to that suggestion the court was justified in assuming that the objection that the paper was not authenticated was waived. It also appeared that there was an appeal from that order which at the time of the trial had not been decided.

The tenth exception relates to the refusal of the court to admit in evidence a copy of the bill of sale tendered by the trustee to Berg. The bill of sale was a vital element of the defendant's case. If it did not include everything he bought at the sale he was justified in refusing to consummate the purchase, and he was entitled to show that as a defense to the charge that he wilfully refused to complete the sale. If the original was filed in the bankruptcy proceedings in the District Court, a certified copy thereof would have been the best evidence of its contents. If it was not so filed, that fact should have been shown, as well as the fact that the original could not be obtained, to warrant the introduction of a copy. *Jones on Evidence,* secs. 209, 212, 217. There was no such showing, so that, while the bill of sale was relevant, the paper offered as a copy of it was on the proof in the case inadmissible and properly excluded.

164

In the examination of Sidney B. Needle, he stated that "I know at the meeting with the representative of the trustee, the purchasers of the inventory and parts were also making the claim." An objection to the statement was sustained, and that ruling, which is the subject of the eleventh exception, seems to be free from error, as the statement referred only to collateral and wholly irrelevant matters.

In the examination of Berg, the witness, after explaining why he had not completed the sale on January 31st, 1939, was asked, "Will you tell his Honor the character of merchandise that was bought through the bid given by Mr. Bailis." An objection to the question was sustained, and that ruling is the subject of the twelfth exception. Following that ruling, Berg was asked whether he knew what Bailis had bought. The defendant also objected to that question. The court, without ruling on the objection, said that so much of the catalogue or list of items to be sold as related to the personal property would be admitted, and then said: "Now, then, you have in what he hoped to buy and the other side objects to your trying to show by him what he actually got or might have gotten the following January. If they object the objection will be sustained." Defendant then made an offer of proof, and the court said: "You put that in and Mr. Ward objects and I overrule it and give Mr. Ward an exception. It is inadmissible but it saves time and makes no difference in my decision in the cases," and defendant then repeated the offer in these words: "The Defendant offers to prove that the Plaintiff, Clarence M. Plitt told him that the Defendant would be held responsible if the Defendant did not get all the merchandise and machinery bought by Max Bailis & Sons; that the representative of the Trustee in Bankruptcy tendered to the Defendant on January 31st, 1939 a Bill of Sale from which was excluded a substantial quantity of merchandise and machinery of the value of fifteen thousand dollars ($15,-000.00) or more which had been sold at the sale to Max Bailis & Sons, and the said representative would not get

the merchandise and machinery so excluded; and that a great deal of the merchandise and machinery excluded from the sale to Max Bailis & Sons was included in the resale." No objection was made to that offer, and defendant was then asked this question: "Q. Tell his Honor whether or not you were ready, willing and able to complete your part of the transaction which we have been talking about if the trustee had delivered to you or he was prepared to deliver to you or had offered to deliver to you the goods and merchandise that had been bought by Max Bailis and Sons." An objection to that question was sustained and that ruling is the subject of the thirteenth exception.

The ruling involved in the twelfth exception appears to be free from injurious error. The question was a proper one, but as there was no dispute as to the character of the merchandise bought by Bailis the error was harmless.

The propriety of the ruling involved in the thirteenth exception is not clear. When it was made the defendant had made no effort to prove the fact alleged in his offer, but undertook by the question to get from the witness a statement that the trustee had neither tendered nor had offered to tender to the defendant the material he had bought. In other words he was asked to give a conclusion based on undisclosed facts. Since he had already said that he had refused to complete the sale, if he had answered "yes," the answer would necessarily have implied that the trustee had neither delivered, nor offered to deliver, to him the goods which he had bought. The crux of the inquiry was a supposed variance between the auctioneer's schedule and the bill of sale, but, although the schedule was referred to in the course of the trial, it was not offered in evidence. But even if the ruling was erroneous, defendant was not injured, for he had already testified that: "I did not take any money with me to complete the sale. I couldn't take $3400.00 and I told them I am going to pay my share, but Mr. Klaff and Mr. Plitt asked me to pay the full amount. I said, I am going to pay my

share, but I am not going to lay out any money for you. I went up to see if the merchandise was there and to look at the bill of sale and get a copy. If they showed me the bill of sale was O. K. and everything was O. K. and they would approve of it, I wasn't going to lay out the money for them. I was in a position to furnish enough money to take care of my bargain. I would have done it the following day or the same day if they told me they were going to be there with their share."

The defendant offered four prayers in each case, of which one, a demurrer prayer, was refused, and the others granted. The refusal of the demurrer prayer is the subject of the fourteenth exception.

Appellant's contention appears to be (a) that the pool agreement was contrary to public policy and void, and that therefore (b) the agreement between Berg, Plitt and Klaff & Co., dealing with rights derived from it, was also void.

It must be conceded that any agreement, concert, or conspiracy to suppress bidding of a judicial sale is contrary to public policy and voidable at the option of the seller, and the court so ruled in this case. *A. L. I. Restatement of Contracts*, sec. 517; 5 *Am. Jur. Auctions*, sec. 27, p. 464; 7 *C. J. S., Auctions and Auctioneers*, sec. 7, p. 1255; 6 *C. J.* 831; 38 *L. R. A., N. S.*, 719; *Smith v. Ullman*, 58 Md. 183. But the mere combination of several persons for the purpose of having one of the group bid for property offered for sale at a public auction, for the joint account of all the members, is neither void nor voidable, unless it is designed to suppress bidding in order that the property offered will be sold at a lower price than it would probably bring at an honest sale, or is otherwise fraudulent, and whether, in a given case, that intent may be found, is ordinarily a jury question. *Ibid.* That principle is thus stated in a note to *Coal & Coke Company v. Marple*, 38 *L. R. A., N. S.*, 720: "The authorities all agree that a contract entered into by several persons, under which one of them is to purchase property at public sale for the benefit of all the parties,

is void as against public policy, and is ground for setting the sale aside where it appears that it was made to prevent competition at the sale or for any other fraudulent purpose. But the great majority of the cases hold that the mere combination does not of itself amount to such fraud as to render the contract unenforceable as between the parties, or to constitute grounds to set aside the sale. Numerous early decisions holding the mere combination of itself fraudulent and as ground for setting aside the sale have been overruled."

If the evidence in the case requires the conclusion that the combination represented by Bailis was formed for the fraudulent purpose of suppressing bidding at the sale, it must follow that the so called sale was illusory and void. If that was true Bailis had nothing to sell. Berg bought nothing, and had nothing to assign.

But the evidence requires no such conclusion. All that it shows is that a group of perhaps twenty four junk and scrap iron dealers agreed among themselves that one of them, acting for the others, should bid on certain material to be offered for sale at a public auction to be held by a trustee in bankruptcy. It is quite consistent with the evidence that no one member of the group was both willing and able to invest as much money as would probably be needed to buy the machinery and personal property of the bankrupt as a whole. If the members of the group were willing to combine to share a risk which no individual member was willing to assume alone, it cannot be said that such an agreement was necessarily against public policy and void. And since at a second sale of the property it brought far less than at the first sale, it may be inferred that the participation of the group stimulated rather than depressed the bidding at the first sale. For, as said in *Kearney v. Taylor*, 15 How. 494, 520, 14 L. Ed. 787, 797; "It is true that in every association formed to bid at the sale, and who appoint one of their number to bid in behalf of the company, there is an agreement, express or implied, that no other member will participate in the biding; and hence, in one sense, it may be said to have the

effect to prevent competition. But it by no means necessarily follows that if the association had not been formed, and each member left to bid on his own account, that the competition at the sale would be as strong and efficient as it would by reason of the joint bid for the benefit and upon the responsibility of all. The property at stake might be beyond the means of the individual, or might absorb more than he would desire to invest in the article, or be of a description that a mere capitalist, without practical men as associates, would not wish to encumber himself with. * * * These observations are sufficient to show that the doctrine which would prohibit associations of individuals to bid at the legal public sales of property, as preventing competition, however specious in theory, is too narrow and limited for the practical business of life, and would oftentimes lead inevitably to the evil consequences it was intended to avoid. Instead of encouraging competition, it would destroy it. And sales, in many instances, could be effected only after a sacrifice of the value, until reduced within the reach of the means of the individual bidders. We must, therefore, look beyond the mere fact of an association of persons formed for the purpose of bidding at this sale, as it may be not only unobjectionable, but oftentimes meritorious, if not necessary, and examine into the object and purposes of it; and if, upon such examination, it is found, that the object and purpose are, not to prevent competition, but to enable, or as an inducement to the persons composing it, to participate in the biddings, the sale should be upheld—otherwise if for the purpose of shutting out competition and depressing the sale, so as to obtain the property at a sacrifice." The illustration cited from *A. L. I. Restatement of Contracts*, sec. 517, Illustration 6, is not in point, since the purpose of the combination postulated there was to pay its members not to bid, while here the purpose of the combination was to have one of the members bid for all, there it is assumed that the members were actual potential bidders, here it does not appear that any member as an individual would have bid at the sale.

But apart from that, the sale was at most voidable at the option of the seller. But the seller did not object to it on that or on any other ground, and the court, after hearing exceptions filed by others to the sale, not only ratified and confirmed it, but adjudged the buyer in default for failing to comply with the terms of sale. The sale to Berg was therefore undoubtedly valid, and the agreement between the members of the group that Bailis buy the property for their joint account was also valid, unless it was designed to perpetrate a fraud, and whether it was made with that intent was a question of fact and not of law. Nor is the validity of that agreement affected by the fact that it contemplated that if the group did buy the property, it would be resold to any member or members of the group who offered to pay more for it than the price bid at the public auction. There was nothing in law or morals which required the group to sell the property at a loss. All the members were responsible *inter sese* for the purchase price, their risk was among themselves joint, and it was not unreasonable that they should all participate equally in any profit realized from a resale, nor that the members of the group should be given the first opportunity of bidding for the bargain, if bargain there was.

But the appellant suggests that the uncontradicted evidence shows that Berg declined to complete the sale because the trustee refused to deliver to him the goods which he bought. If the record supports that contention, obviously the plaintiffs were not entitled to recover, but it does not. Berg and Sidney B. Needle, his attorney, did testify that Berg refused to complete the sale because the plaintiffs refused to contribute to the payment of the purchase price unless he secured all the property covered by Bailis' bid. On the other hand Silberstein testified: "The result of the conference was that Mr. Berg would not go through with the purchase himself, and there was no way that Mr. Klaff or Mr. Plitt could go through, as the purchase was recorded in Berg's name only. An effort was made to put up Mr. Berg's money

for him and let the sale go through by an assignment to be given by him of his interest, and he refused to do it and refused to allow the sale to be consummated." The defendant offered to prove that the trustee offered Berg a bill of sale consummating the sale, which failed to include material worth $15,000 included in the schedule covered by Bailis' bid, and that he refused to correct the same and deliver said merchandise, but offered no evidence to show those facts, for manifestly the offer was not evidence.

It follows therefore that defendant's demurrer prayer was properly refused. Finding no error in the rulings involved in the appeal, the judgments will be affirmed.

*Judgments affirmed, with costs.*

On Motion for Reargument.

The appellant's motion for a reargument in this case is based upon the exclusion of a purported copy of a bill of sale alleged to have been tendered to the appellant by the trustee in bankruptcy. The opinion decides that the exclusion was proper because the copy was not authenticated. Appellant in the motion points out that while the fact was not referred to in the written or oral arguments on his behalf, nevertheless counsel stipulated at the trial that uncertified copies of relevant documents might be used as evidence. In view of that stipulation the objection to the admission of the copy because it was not certified disappears. Nevertheless, it is not apparent that the appellant was injured by its exclusion when offered. Later in the course of the trial, appellant made an offer to prove certain facts, and among others the bill of sale. The court thereupon informed counsel for appellant that any objection by the appellee to the evidence included in the offer would be overruled. Notwithstanding that, the appellant submitted no evidence tending to prove the facts in the offer. The fact that the court stated that, although it would overrule an objection to it, it still thought the evidence inadmissible could not possibly remedy the

failure of the appellant to prove the facts stated in the offer. Appellant was given an opportunity to complete the record and to avoid any injurious consequences of the erroneous exclusion of the copy of the bill of sale but declined to take advantage of the offer.

Moreover, the Unied States District Court for the Middle District of Pennsylvania had vacated the sale and had ordered the Trustee to retain the deposit as liquidated damages. That order was necessarily based upon a finding that the Trustee had offered to deliver to Berg the goods which he had bought, and that Berg had without legal excuse failed to complete the purchase. He had received of the appellees money for a purpose which failed because of his default and which he was legally bound to restore to them. If in fact the Trustee refused to deliver the goods sold to Berg, he could have shown that fact in the District Court. On the record the sale was valid. If he was tendered what he bought he was bound to pay for it and take it. So far as the record shows the District Court decided that he had defaulted on that obligation. If it did so decide, manifestly the question can not be re-litigated here. If it did not so decide, the defendants should have shown that, and should also have shown by appropriate evidence that the bill of sale did not cover the goods listed in the auctioneer's schedule or list, but that was not done either.

*The motion will therefore be overruled.*