CHEVY CHASE VILLAGE ET AL. *v.* JAGGERS ET UX.

[No. 291, September Term, 1970.]

*Decided March 29, 1971.*

310

The cause was argued before HAMMOND, C. J., and BARNES, McWILLIAMS, FINAN, SINGLEY, SMITH and DIGGES, JJ.

*Rourke J. Sheehan*, with whom were *Arthur G. Lambert* and *Gary H. Simpson* on the brief, for appellants.

*Charles W. Foster* for appellees.

DIGGES, J., delivered the opinion of the Court.

The beginning of this case, which involves the efficacy of a residential restrictive covenant, can be traced back to 1927 when the Chevy Chase Land Company recorded a plat subdividing a part of what was to become the rather fashionable suburban community of Chevy Chase Village in Montgomery County, Maryland. The subdivision in question, blandly called "Section 1-A Chevy Chase" on the plat. was composed of thirteen blocks, numbered 4 through 16. Blocks 6 and 11 contained 60 lots which, because of their location on the northeast corner of the intersection of Wisconsin and Western Avenues, were set aside for commercial development. Two lots in or near that section were conveyed to public utilities. The other blocks were reserved for exclusively residential purposes. With the exception of six lots conveyed to a church and three lots partially destroyed by later re-subdivision, the 204 remaining lots in the residential blocks were bound by the following series of covenants in each of the original deeds by which they were conveyed:

> . . . .
> It is hereby understood and agreed that no objection will be raised by the said party of the second part [grantee], her heirs and assigns, to the rezoning of Lots in Blocks 6 and 11 in said subdivision known as "Section One-A, Chevy Chase," Montgomery County, Maryland, for use for commercial purposes.
> . . . .
> In consideration of the execution of this deed the said party of the second part, for herself her heirs and assigns, hereby covenants and agrees with the party of the first part, its successors and assigns (*such covenants and agreements to run with the land*) as follows, viz:
> 1. That all houses upon the premises hereby conveyed shall be built and used for residence purposes exclusively, except stables, carriage

houses, sheds or other outbuildings, for use in connection with such residences and that no trade, business, manufacture or sales, or nuisance of any kind shall be carried on or permitted upon said premises.

. . . . (Covenants 2 through 4 pertaining to location, cost and design of buildings are omitted.)

5. That a violation of any of the aforesaid covenants and agreements may be enjoined and the same enforced at the suit of The Chevy Chase Land Company, of Montgomery County, Maryland, its successors and assigns (*assigns including any person deriving title mediately or immediately from said company to any lot or square, or part of a lot or square in the Section of the Subdivision of which the land hereby conveyed forms a part*). [Emphasis added.]

It is these covenants which have spurred the case before us. The plaintiff-appellants, Chevy Chase Village, a landowner and a municipal corporation (having the responsibility by charter to enforce restrictive covenants) and Wales H. Jack and his wife, residents of the subdivision, have appealed from a decision by the Circuit Court for Montgomery County (Shure, J.) denying an injunction against the defendant-appellees, Dr. Frank Y. Jaggers, Jr. and his wife. This action in equity sought to enjoin the doctor from using his property as a principal office for the practice of medicine, alleging that such use was in contravention of the covenants.

In 1947, Dr. Jaggers and his wife purchased a lot in Section 1-A on the corner of Wisconsin Avenue and Grafton Street and lived on the premises until early 1967. During most of those twenty years he maintained his medical office on the property. In 1948 he spent $5,000 converting his garage into office space, and in 1959 an additional $15,000 outlay was made to enlarge this office. During this time he had a very substantial practice, which apparently has tapered off in recent years. In 1954, Dr.

Jaggers applied to the Montgomery County Board of Appeals for a special exception to use his property both as his dwelling and for the practice of medicine in association with another doctor. The special exception was granted with no objection being raised by any of the residents of Section 1-A. Although he worked intermittently over the years with other doctors, Dr. Jaggers is at present the sole practitioner in the office. There are also three other doctors in the subdivision who live and maintain principal offices at their homes, and have done so for some time. In 1967 the Jaggers moved to Potomac, Maryland, renting their house as a residence, although the doctor continued to maintain the office for his practice. It should be noted that the dwelling is now rented to a physician for residential purposes only.

Chevy Chase Village notified appellees that this action would be in violation of the covenants binding on the property, but the weight of its logic obviously fell on deaf ears, for the doctor was not deterred. We are a more receptive audience, however, and shall reverse the lower court's decision. There are four questions presented for our consideration:

I. Was there sufficient evidence to establish a uniform general scheme or plan of development to entitle the appellants to enforcement of the covenants?

II. Was there an abandonment and failure of the original plan of development and such a change in the general characteristics of the neighborhood as to render the covenants unenforceable?

III. Were the appellants guilty of laches and therefore estopped from the enforcement of the subject covenants?

IV. Under the doctrine of comparative hardship should the court decline to enforce the restrictive covenants?

## I

The first contention which the appellees make is that there was insufficient evidence to establish a uniform general plan of development as would entitle appellants to

enforce the covenants. However, even if such a plan were absent it would not necessarily defeat their enforcement. The law in Maryland is well settled on this question. In *Rogers v. State Roads Comm.*, 227 Md. 560, 564, 177 A. 2d 850 (1962) we said: "There need not be any general plan of development in order to make a restrictive covenant enforceable, if it is imposed by a grantor on a single tract conveyed by him for the benefit of adjacent property retained by him." This view was also expressed by Judge Offutt for the Court in *McKenrick v. Savings Bank*, 174 Md. 118, 128, 197 A. 580 (1938), where it was said:

> ". . . one owning a tract of land, in granting a part thereof, may validly impose upon the part granted restrictions upon the use thereof for the benefit of the part retained, and upon the part retained for the benefit of the part granted, or upon both for the benefit of both; that, where the covenants in the conveyance are not expressly for or on behalf of the grantor, his heirs and assigns, they are personal and will not run with the land, but that, if in such a case it appears that it was the intention of the grantors that the restrictions were part of a uniform general scheme or plan of development and use which should affect the land granted and the land retained alike, they may be enforced in equity . . . ."

See, e.g., *Gnau v. Kinlein*, 217 Md. 43, 141 A. 2d 492 (1958) ; *Turner v. Brocato*, 206 Md. 336, 111 A. 2d 855 (1955) ; *Adams v. Parater*, 206 Md. 224, 111 A. 2d 590 (1955) ; *Schlicht v. Wengert*, 178 Md. 629, 15 A. 2d 911 (1940) and Note, 2 Md.L.Rev. 265 (1938).

In the present case we need not decide whether there was a uniform general plan of development, though the evidence may well support such a finding. The covenants are enforceable in any event because of the specific language used in the deeds. The applicable law on this point was enunciated years ago and has remained basically un-

changed. In *Clem v. Valentine*, 155 Md. 19, 26-27, 141 A. 710 (1928) our predecessors, quoting from *Halle v. Newbold*, 69 Md. 265, 14 A. 662 (1888), which referred to even earlier decisions, said:

> " 'These cases very conclusively settle the law that the grantor may impose a restriction, in the nature of a servitude or easement, upon the land that he sells or leases, for the benefit of the land he still retains; and if that servitude is imposed upon the heirs and assigns of the grantee, and in favor of the heirs and assigns of the grantor, it may be enforced by the assignee of the grantor against the assignee (with notice) of the grantee.' It is to be noted that that case was one in which the covenant expressly provided that its terms should be binding on the assigns of both the covenantor and the covenantee, and it was there held that this enabled an assignee of the covenantee to enforce the restriction . . . ."

*E.g., Rogers v. State Roads Comm., supra; Martin v. Weinberg,* 205 Md. 519, 109 A. 2d 576 (1954) ; *Raney v. Tompkins,* 197 Md. 98, 78 A. 2d 183 (1951).

In the case before us, the covenants are clearly binding on the successive owners. Not only is there an express provision that the covenants "run with the land," but it also is explicitly stated that they are binding upon the grantee "her heirs and assigns" and enforceable by the grantor, "its successors and assigns." As if this very lucid language were unclear, the deed defines an assignee as any person who obtains title "mediately or immediately," from the grantor. We need not pursue this question further, but if there are any lingering doubts, see *Kirkley v. Seipelt,* 212 Md. 127, 128 A. 2d 430 (1957), and *Middleton Realty v. Roland Park,* 197 Md. 87, 78 A. 2d 200 (1951), where similar problems were involved.

## II

The second claim made by the appellees is that there has been an abandonment and failure of the original plan of development and a substantial change in the general characteristics of the neighborhood so as to render the covenants unenforceable. We have no quarrel with the underlying statement of law implicit in this argument, but think it is inapplicable to the facts of this case. Indeed, on many occasions we have held restrictive covenants unenforceable where there has been ". . . deterioration in the residential character of the neighborhood or a failure from the beginning of the restricted development, so that the restrictions no longer served their intended purpose." *Texas Co. v. Harker,* 212 Md. 188, 196-97, 129 A. 2d 384 (1957). In that same case at 198, quoting from 4 A.L.R.2d 1118, 1119, we said:

> "Most jurisdictions now recognize a change in the character of a neighborhood as a ground for affirmative relief against restrictive covenants by way of cancellation or modification *where the change has been so radical as to render perpetuation of the restriction of no substantial benefit to the dominant estate, and to defeat the object or purpose of the restriction."* (Emphasis added.)

*Accord, Rogers v. State Roads Comm., supra,* 227 Md. at 566. The inquiry, therefore, is whether there has been a complete or radical change in the neighborhood causing the restrictions to outlive their usefulness. *Gnau v. Kinlein, supra; Needle v. Clifton Realty Corp.,* 195 Md. 553, 73 A. 2d 895 (1950); *Talles v. Rifman,* 189 Md. 10, 53 A. 2d 396 (1947); *Gulf Oil Corp. v. Levy,* 181 Md. 488, 30 A. 2d 740 (1943); *Whitmarsh v. Richmond,* 179 Md. 523, 20 A. 2d 161 (1941).

The only evidence here in any way tending to support appellees' contention is that a very few of the more than 200 lots have not been utilized for homes. These nonresi-

dential uses are confined to a church, four doctors' offices maintained in their residences, a few feet of several lots located on the outer perimeter utilized for parking, two lots used by public utilities and one full lot with minor parts of two others infringed upon by a building constructed mainly on the commercial blocks. These minimal deviations from the original plan are not sufficient to show a change in the neighborhood that is either complete or radical. In this case, the purpose of the restrictions was to preserve the subdivision predominantly for residential use, and with the few negligible exceptions mentioned this is still being accomplished. On this point we think the following words of *Kirkley v. Seipelt, supra* at 135, are particularly appropriate:

> "The real crux of the inquiry in determining whether there has been such a change in the neighborhood so as to defeat the covenant is to ascertain the purposes to be accomplished by the imposition of the restrictions. . . . [W]e think the reasons for them were to develop an attractive and inviting community. From the evidence, it is apparent the reasons and objects for placing the restrictions on the property are as active and as alive today as they were when first imposed."

The appellees further contend that the trial court was correct in looking beyond Section 1-A to determine if there had been a change in the neighborhood. We agree that this is a proper view of the law, but in applying the law to the facts the appellees are again found wanting. In *Texas Co. v. Harker, supra,* we permitted an investigation of the broader neighborhood but nevertheless concluded that nearby commercial uses had in no way deteriorated the residential character of the subdivision under fire in that case. From the record before us, which includes aerial photographs and testimony, it is clear that the residential part of Section 1-A has been similarly unaffected. Indeed, it is still a highly desirable place for a

home, completely unspoiled by commercialism. The appellees argue that the mere setting aside of Blocks 6 and 11 for commercial purposes was evidence of a failure *ab initio* of the original plan, but we can only comment that this use was exactly what was contemplated in the original plan and was in fact agreed to by nearly all of the lot purchasers. In any event the development of this commercial area has not deteriorated residential development in the remainder of the subdivision.[1] On the contrary, the presence of a tasteful and well planned shopping center, which includes the Washington branch of Saks Fifth Avenue, complements the neighborhood.

## III

The Jaggers' third contention is that the appellants have been guilty of laches and should therefore be estopped from seeking enforcement of the covenants. To support this claim they not only rely on the fact that three other doctors in the subdivision are using their homes for their principal offices, but also that Dr. Jaggers had used his property for the practice of medicine for nearly twenty years without objection. We need not decide whether the appellants had waived their rights to enforcement of the restrictions with respect to the other three doctors. It is true that these offices may violate the restrictive covenants, *Grubb v. Guilford Ass'n*, 228 Md. 135, 178 A. 2d 886 (1962) ; *Osborne v. Talbot*, 197 Md. 105, 78 A. 2d 205 (1951), but the appellants, from their testimony, indicate that they have no objections to a combined office-home use. Consistent with this position, they had no objection to Dr. Jaggers' combined use of the property from 1947 on—until the time he moved to Potomac. The real issue then is whether the waiver, if there was one, was broad enough to permit the doctor to move his residence, rent his home, still maintain his office on

---

1. It is interesting to note that in the recent case, Chevy Chase Village v. Mont. Co., 258 Md. 27, 264 A. 2d 861 (1970), we determined that there had been insufficient change in the residential character of this same neighborhood to warrant commercial rezoning.

the premises, and yet not be in violation of the covenant. We hold the possible waiver did not go this far. In February 1967, the appellant, Chevy Chase Village, informed Dr. Jaggers by letter that his property would not be available as an office if he moved his residence elsewhere. Under these new circumstances, precipitated by Dr. Jaggers' own action, this was a timely assertion of their right to enforce the covenants. As the Court said in *Schlicht v. Wengert, supra,* 178 Md. at 636-37 :

> "And toleration of violations, out of friendship or lack of inclination until incidental · annoyances grew to make the Schlichts feel a grievance, could not be construed as surrender of those rights. They refrained from a contest until experience with the particular violation stirred them to enforcement; and they might do so without loss of rights from it."

So whether appellants should or should not have been estopped from enforcing the restrictive covenants under the conditions existing prior to 1967 is not relevant to the changed circumstances after 1967. Any waiver that may have existed was limited to the use of the office *incidental* to his living on the property. Once appellees moved, however, such use ceased to be incidental and the appellants could still assert their rights to enforce the restrictions.

Pursuing this same point, the appellees contend that there was great significance in the fact that no one from Section 1-A objected when the Montgomery County Board of Appeals granted the Jaggers' request for a special exception to use their premises for the practice of medicine. In view of our holding in *Martin v. Weinberg, supra,* 205 Md. at 527-28, that "[c]ontractual restrictions are neither abrogated nor enlarged by zoning restrictions", we do not share their enthusiasm for this evidence of waiver. *See also Perry v. Board of Appeals,* 211 Md. 294, 127 A. 2d 507 (1956) ; *Chayt v. Maryland Jockey Club,* 179 Md. 390, 18 A. 2d 856 (1941). We point out

that even if this silence were relevant on the question, the proceeding before the zoning board would only be indicative of the neighbors' acquiescence in the combined use of the property as a home and as an office, not as an office and rental property without the owner living on the premises.

## IV

The final argument the doctor makes is that if he must return to his former home or remove his office to comply with the covenants, he will suffer great hardship and inconvenience when he has only caused negligible harm to his neighbors. He invokes the equitable doctrine of comparative hardship to avoid this result. That doctrine has been explained with forceful clarity by Chief Judge Hammond for the Court in *Dundalk Holding Co. v. Easter,* 215 Md. 549, 555-57, 137 A. 2d 667, *cert. denied,* 358 U. S. 821, rehearing denied, 358 U. S. 901 (1958), which was recently reaffirmed in *Grant v. Katson,* 261 Md. 112, 274 A. 2d 88 (1971). It basically provides that a court may decline to issue an injunction where the hardship and inconvenience which would result from the injunction is greatly disproportionate to the harm to be remedied. Innocent mistake on the part of the party to be enjoined is a factor to be considered in applying the doctrine. Overlooking the fact that the doctor, though a mediate purchaser whose deed only made reference to the restrictive covenants in his predecessor's deed, should have been aware of the limits on the use of his property, we do not think he can invoke the doctrine by characterizing the potential harm that might result to his neighbors' homes as comparatively negligible. Their interest in preserving the residential integrity of their community is simply not outweighed by his desire to move to another fashionable and exclusively residential area. With the facts before us in this case, had the trial judge declined to issue the injunction because of comparative hardship, we would not have hesitated to overrule him for a clear abuse of discretion. As he only went so far as to find that there had been a change in the neighborhood capable of

vitiating the restrictive covenants, we base our reversal on this fact. On remand we direct that the appellees be enjoined from using their property in Chevy Chase Village for the practice of medicine unless they actually reside on the premises.

> *Decree reversed and the case remanded for the passage of a decree in conformity with this opinion. Costs to be paid by appellees.*