ST. LUKE'S HOUSE, INC. *v.* DiGIULIAN

[No. 79, September Term, 1974.]

*Decided April 8, 1975.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*William A. Volkman, Jr.*, for appellant.

*David M. Davenport*, with whom were *Roman, Davenport & Davenport* and *Kenneth E. Conklin* and *Conklin & Noble* on the brief, for appellee.

O'DONNELL, J., delivered the opinion of the Court.

The appellant, St. Luke's House, Inc. (St. Luke's), aggrieved at the entry of a judgment in the amount of $1,850 in favor of the appellee, Rita E. DiGiulian (on her counter-claim), for breach of a written lease, following a nonjury trial in the Circuit Court for Montgomery County (John J. Mitchell, J.), urges us to reverse.

In January 1971 Mrs. DiGiulian purchased the property known as 3910 East-West Highway located in Section 4 of the Town of Chevy Chase, intending to use it as a residence for herself and her family. After the completion of extensive remodeling and restoration the idea of occupying it as a residence was abandoned and a "For Rent By Owner" sign was posted on the property. Mrs. Audrey M. Henrickson,[1] a licensed realtor with the Routh Robbins Real Estate Company induced Mrs. DiGiulian to give her a listing on the property, stating that she had a South American diplomat as a prospective tenant. When that tenancy did not materialize, Mrs. Henrickson, a member of the Board of Directors of St. Luke's and, together with the president of the Board, a member of its Site Procurement Committee, succeeded in having a lease executed between St. Luke's and Mrs. DiGiulian. St. Luke's, a private, nonprofit organization, operating "halfway houses" designed to provide a

---

1. Remarried as Mrs. Audrey Goss at the time of trial.

transitional step for those recuperating from mental illnesses who had been released from institutional care and were being returned to community life, had been searching for a home like the DiGiulian premises for use as such a "halfway house."

The lease, on a standard form of the Routh Robbins Real Estate Company, was in pertinent parts prepared by Mrs. Henrickson in collaboration with Frank H. Dearden, Jr., president of St. Luke's Board and also a professor at the University of Maryland School of Social Work and Community Planning. The lease, for a two-year term, effective July 1, 1971, was for a total rental of $19,200 "payable in monthly installments of $800." Standard printed clauses therein provided that it "contains the entire agreement between the parties hereto and shall not be changed or modified in any manner except by an instrument in writing executed by the parties hereto"; and that the tenant "will not use and will not permit the property or any part thereof to be used for any . . . unlawful purpose." Provision was also made in the lease for the payment of a commission of $400 to Mrs. Henrickson.

Paragraph 3 of the lease, as modified by an addendum, provided as follows:

> "Tenant will use said property as a residence for five (5) persons and for no other purpose or additional number of persons whatever, subject to modifications noted in Addendum Clause #1.
>
> Addendum #1 — It is understood and agreed that Tenant intends to apply for and to obtain a permit and/or variance and license to operate a boarding house from the proper Montgomery County or Chevy Chase authorities which would allow Tenant to have up to nine residents and two employees living on the premises. Should the Tenant be unable to secure the necessary permits by April 1, 1972, then Tenant may give Landlord thirty (30) days' notice of intent to vacate. If such notice is not forthcoming by July 1, 1972, then this provision will be deemed waived. . . ."

Another addendum provided that the tenant in each quarter would deposit with an escrow agent a sum equal to one-quarter's rent ($2,400) for disbursement to the landlord.[2]

Two restrictions on the use of the property were the catalysts which gave rise to the litigation; one, the Montgomery County zoning ordinance which restricted occupancy in a single family dwelling, in an R-60 zone, to not more than five unrelated adults, but subject under the zoning ordinance to "a special exception";[3] the other, a restriction contained in a covenant running with the land under a deed dated 1910 from the Chevy Chase Land Company of Montgomery County, Maryland, to which Mrs. DiGiulian's property — and the other lots in Section 4 — was subject, and which provided that "all houses upon the premises hereby conveyed shall be built and used for residence purposes exclusively . . . and that no trade, business, manufacture or sales, or nuisance of any kind, shall be carried on or permitted upon said premises." The restrictions in the deed further provided that any house erected upon the land "shall be designed for the occupancy of a single family" and that any violation of such covenants and agreements might be enjoined by the Chevy Chase Land Company, including those who derive title from said company.

Prior to August 16, 1971 it appears that there had been extensive newspaper publicity concerning the nature of the occupancy of the premises by St. Luke's; there had been several meetings between the Board of Directors of St. Luke's and the "Council" of Section 4 of Chevy Chase, as well as a "citizens' meeting," as a result of all of which the neighbors, residents in Section 4, had given notice of their intention to seek injunctive relief against the operation of the "halfway house." Although furniture had been moved into the premises in early July, it had not yet become occupied when, on August 16th, the Board authorized its

---

**2.** By error the money deposited with the escrow agent was in fact paid over to Mrs. DiGiulian.

**3.** *See* § 111-10 (a) and (b), § 111-9 (b) and § 111-2, Vol. 3, Montgomery County Code (1965), in effect at the time of the execution of the lease.

attorney to file the necessary petition for special exemption under the zoning law, as contemplated in Addendum #1.

Before the petition could be filed the Circuit Court for Montgomery County (Shure, J.), following a bill of complaint filed by 13 neighbors and the Town Council of Chevy Chase, on August 17th, pursuant to Maryland Rule BB72, issued an *ex parte* injunction restraining both the appellant and appellee "from operating a Halfway House on the leased premises known as 3910 East-West Highway."

Counsel for the Board upon ascertaining that the restrictive covenant appeared to be identical to that applied by this Court in *Chevy Chase Village v. Jaggers*, 261 Md. 309, 275 A. 2d 167 (1971), wrote an opinion for the Board in which he concluded that the filing of a petition for special exception, even if allowed, would not grant relief from the restriction in the deed and that St. Luke's could not successfully defend its postition against the restriction. He advised St. Luke's "to immediately seek another location," to remove all equipment from the premises and to treat the lease as null and void.

Although St. Luke's filed an answer in the injunction proceedings in which it disclaimed knowledge of the existence of the "covenants" in the deed, and contended, *inter alia*, that its use of the premises would constitute a use under the zoning ordinance by a "family," it did not otherwise contest the injunction granted, but vacated the premises. When the injunction proceedings came on for hearing on September 24, 1971, the complainants' motion for dismissal on the grounds of mootness was granted since St. Luke's had discontinued the use of the premises and they had been re-leased.

When St. Luke's abandoned the building Mrs. Henrickson still acting as the agent for Mrs. DiGiulian, secured another tenant for a lease commencing September 15, 1971 and ending April 30, 1972, at a monthly rental of $500.

St. Luke's sued Mrs. DiGiulian when she refused to refund $1,600 of the deposited rent; under her counter-claim she was awarded damages computed at $800 per month for the period July 1 to September 15, 1971 ($2,000), plus $300 per

month from September 15, 1971 to April 15, 1972, and $150 for the period April 15 to April 30, 1972 (totalling $4,250), less credit for the $2,400 deposit.

In urging a reversal St. Luke's contends (a) that the trial court erroneously excluded parol evidence which, if admitted, would have established "mutual mistake" as to the restrictive covenant; (b) that the restrictive covenant, running with the land, created a "frustration of use" and/or an "impossibility of performance" which granted the lessee the right to rescind the lease and (c) that the lease was breached by the appellee since she leased the premises for a purpose not allowed by the restrictive covenant and she failed in her duty, upon the institution of the injunction proceedings, to defend the tenant's "implied warranty of quiet enjoyment." [4]

At the trial counsel for St. Luke's, upon direct examination of Dearden, asked: "What was the purpose of that lease to be in terms of St. Luke's House?" Appellee's objection, on the ground that "the lease will speak for itself," was sustained, counsel conceding, however, "[t]heir understanding or attempts to negotiate will be something else." Notwithstanding the sustaining of the objection to that question, Dearden did testify, without objection, that there had been extensive discussions with Mrs. DiGiulian concerning the purpose for which her house would be used, that she was informed that it was to be "used as a halfway house for people recovering from mental illness," and that she did not indicate any constraint upon such use other than under the zoning laws.

Mrs. Henrickson similarly testified, without objection, that she had explained to the appellee the purpose for which the house was needed. Although an objection was sustained to a question addressed to her as to whether she was given any indication "that the purpose which you had discussed with Mrs. DiGiulian could not come to pass as a result of any restriction," she testified, without objection, that

---

4. It does not appear that Mrs. DiGiulian, a resident of the District of Columbia, was ever served with the injunction; she first was aware of it when she received the letter from St. Luke's attorney demanding the return of $1,600.

Mrs. DiGiulian had not indicated to her any "restriction" other than zoning upon the use of the property.

The attorney who was commissioned to prepare the petition for special exception and who prepared the opinion for the Board testified that he was "reasonably certain" that he was a member of St. Luke's Board at this time, and although he was familiar with the restrictions in Section 4 of Chevy Chase, he was apparently not consulted when the lease was executed.

Also without objection, Mrs. DiGiulian testified that when both Mrs. Henrickson and Dearden explained to her that they wanted to use her property as a "halfway house" she told Mrs. Henrickson, whom she did not know, at that time, to have been a member of St. Luke's Board, that the property could only be used as a residence and that "if she had anything else [contemplated] that she must check thoroughly with the 'state' [zoning], as well as [under] 'Section 4' [Chevy Chase] . . . and that is written on my deed," to which Mrs. Henrickson replied: "Don't worry about it because she [Mrs. Henrickson] had been renting and selling within this area for a long time." The appellee further, without objection, testified that when Dearden explained the purpose for which the house would be used she replied: "Remember, this is only, could be used as far as I am concerned, it is always used as a residence, but if you check with the state and with Section 4 and you get the permission, only if you get the permission, but don't ever say that I gave you this home as anything but a residence." She also testified that in her dialogue with Dearden he represented to her that St. Luke's had "other uses for the property, other than as a halfway house."

There was additional testimony from Mrs. DiGiulian that she "would have no parts of anything, but as a 'residence' " and that although she was aware of a restriction in her deed she did not check it because Mrs. Henrickson "was working for me" and was being paid for representing her in renting her property.

Although it is true that " 'while parol evidence is not admissible to alter or vary a written instrument expressing

an agreement, it may be admitted to show that, because of a mutual mistake of the parties, their minds never met as to its subject-matter, and that consequently there never was an agreement. Where that fact is clearly shown, it is generally but not uniformly held that the instrument may be cancelled.' " *Smith v. Bounds Package Corp.*, 206 Md. 74, 79, 110 A. 2d 71, 73 (1954), quoting from *Gross v. Stone*, 173 Md. 653, 665, 197 A. 137, 142 (1938). *See also 4500 Suitland Rd. Corp. v. Ciccarello*, 269 Md. 444, 451-52, 306 A. 2d 512, 516 (1973). In view of the length and breadth of the parol evidence received without objection from Mrs. Henrickson, Dearden and Mrs. DiGiulian, the principals in the negotiations of the lease, it is clear to us that the trial judge did not exclude parol evidence which might have established "mutual mistake." Although it is true that objections were sustained in two instances to questions addressed to the appellant's witnesses, it is patent that such objections were sustained as to the form of the questions propounded rather than to an exclusion of parol evidence. In any event, assuming *arguendo* that there may have been error in sustaining the objections in those two instances, such error must be considered harmless since the witnesses were otherwise permitted to give the same testimony, under questions in different form, and did, in fact, testify to each aspect of the pre-execution negotiations between the parties. *See Riley v. Naylor*, 179 Md. 1, 16 A. 2d 857 (1940); *Snyder & Blankfard, Co. v. Farmers' Bank of Tifton*, 178 Md. 601, 16 A. 2d 837 (1940); *Berg v. Plitt*, 178 Md. 155, 12 A. 2d 609, *reargument denied*, 13 A. 2d 364 (1940).

In rejecting the contention that St. Luke's had no knowledge of the covenant and that thus there had been no "meeting of the minds," the trial court found that the negotiations leading up to the lease were conducted by Mrs. Henrickson who had assumed "a dual role, that of rental agent for Mrs. DiGiulian and that of [a] representative of St. Luke's," and that even though it was her testimony "that she considered herself to be representing St. Luke's and not Mrs. DiGiulian at the time St. Luke's entered the negotiations, this belief was never actually communicated to Mrs. DiGiulian." The trial court further found that "[i]n either

capacity, Mrs. Goss [Henrickson] should have been aware of any covenants running with the land and certainly as a representative of St. Luke's should have known those facts, unless she believed them not to be an impediment to the prospective use of the property." The trial court also pointed out that both the lease and the addenda, prepared by Mrs. Henrickson and Dearden, were "in terms most favorable to St. Luke's."

We cannot say that these conclusions by the trial court, which had the opportunity to pass upon the credibility and the weight to be given the evidence, were clearly erroneous.

Finding that the holdings in *Chevy Chase Village v. Jaggers, supra,*[5] were not dispositive of the issue of an "impossibility of performance" on the part of St. Luke's and were, on the facts, distinguishable, since *Jaggers* involved the use of a residence for a purely business purpose, the trial court concluded that St. Luke's before terminating the lease had a "minimal obligation" to contest in court the issuance of the injunction. Pointing out that the questions of law involved in the injunction were different than those then before the trial court and that it would be "senseless to speculate as to the ultimate outcome of the injunction" proceedings, the trial court nonetheless observed that "there were already in existence certain exceptions to the covenants which had been permitted," that it was by no means certain that the contemplated use of the premises by St. Luke's was

---

5. In Chevy Chase Village v. Jaggers, 261 Md. 309, 275 A. 2d 167 (1971), Jaggers, a physician, in 1954 without any objections being raised by the residents of Chevy Chase Village, obtained a special zoning exception to operate a physician's office in his residence in that Village. When the Jaggers moved to Potomac in 1967 they rented their home as a residence but Dr. Jaggers continued to maintain a medical office in the home. Chevy Chase Village instituted injunction proceedings to enforce a covenant running with the land, which prohibited the conduct of a trade or business in "Section 1-A, Chevy Chase." This Court, holding that the restrictive covenants ran with the land and could be neither abrogated nor enlarged by zoning regulations, found that there had not been a waiver of the restrictions by a failure to object when the "special exception" had been granted Jaggers; and, contrary to the findings of the trial court, concluded that there had been no abandonment or failure of the original plan of development by substantial changes in the neighborhood so as to vitiate the covenant and render it unenforceable. Reversing the lower court Jaggers was enjoined from using the property for the practice of medicine unless he actually was a resident upon the premises.

not primarily "for residential purposes" and therefore not in violation of the restrictive covenant, but that "at no time did St. Luke's do anything to challenge the injunction" and thus could not justify its termination of the lease on the existence of the restrictive covenant or upon the issuance of the *ex parte* injunction, purportedly undertaken to enforce the covenant, which went uncontested by St. Luke's.[6]

The result reached by the trial court is in accord with the rationale of our holdings in *McNally v. Moser*, 210 Md. 127, 122 A. 2d 555 (1956), which we find to be determinative of the principal contention raised by the appellant, that the restrictive covenant — and the *ex parte* injunction — created a "frustration of use" and/or an "impossibility of performance." In *McNally* a chiropractor, who had been an assistant to Dr. Moser, purchased his practice and equipment and rented the office space from the appellee in 1951 for a ten-year term. Prior to an incapacitating illness Dr. Moser had maintained the office space on the ground floor of the building in which he resided. McNally, a nonresident of the building, notified the appellee in 1954 that it was his understanding the lease terminated in 1955. When counsel for Dr. Moser advised McNally that the lease ran until 1961, the appellant solicited an opinion from the Building Inspector that "this property may not be used for a doctor's office unless the doctor resides on the premises," but McNally took no action to officially discover whether his use did violate the zoning laws. The lessors, after an evidentiary hearing, obtained a declaratory judgment in 1955 that the lease continued and was valid until 1961. In affirming that decision this Court held that a tenant who relies on the illegality or invalidity of a lease has the burden of establishing the illegality or invalidity and may not rely upon such a contention where the doing of that, said to be forbidden, may reasonably be made legal and possible through either administrative or judicial action; that the receipt of the notice by McNally from the zoning authorities

---

6. The trial court also found that St. Luke's had failed to file the petition for special exception, *see* Barnes v. Euster, 240 Md. 603, 214 A. 2d 807 (1965), but we do not see that issue as critical since under Addendum #1 the tenant had until April 1, 1972 to secure such a permit.

in response to his inquiry did not constitute a "constructive eviction" and did not justify him in accepting the fact that such use was illegal, but that he was under an obligation to contest the right to continue his use of the office; and that he could not rely on merely a possibility of the illegality of the use, but was required to show that the impossibility of the use was a fact.

Judge Hammond (later Chief Judge), for this Court, stated:

> "The defense of the appellants, based on illegality, has two prongs. The first is that the lease was an illegal bargain when it was made because the zoning ordinances then in effect made illegal the use of the leased premises for non-resident professional offices, and second, that Zoning Ordinance No. 711, adopted in May, 1953, made the previous use illegal. There was not at the trial, and is not here, any contention that the lease does not continue until 1961 unless the appellants are right in their contention as to illegality. *It was they who pleaded illegality, it is they who had the duty of producing evidence to show it, and finally, it is they who had the burden of persuading the court that they had established the illegality.* One who relies on illegality, failure of consideration or other affirmative defenses, has imposed on him the burden of persuasion. *Borchard, Declaratory Judgments,* 2nd Ed., p. 405-9. *Shedlinsky v. Budweiser Brewing Co.* (N.Y.), 57 N. E. 620; *Dickson v. Uhlmann Grain Co.,* 288 U.S. 188, 77 L. Ed. 691; *Palmer v. Chamberlin* (C.A. 5th), 191 F. 2d 532; *Romanus v. Biggs* (S.C.), 51 S.E.2d 503; *Bryan v. Pasadena Holding Co.* (Calif. App.), 35 P. 2d 334." (Emphasis supplied.) 210 Md. at 133, 122 A. 2d at 558-59.

\* \* \*

> "If it was the ordinance of 1953 that made illegal a use theretofore legal, this supervening happening

might have created an impossibility of performance or a frustration of the purposes of the lease, that would allow the tenants to terminate the lease and end their responsibility under it. This is so because, as we have noted, it was not contemplated by the parties that there would be any impossibility or frustration and the tenants did not bind themselves to pay rent regardless of any such happening, although they could bindingly have done so, since the bargain would not have been against public policy or public morals. *Restatement, Contracts*, Sec. 458, and see also, Sec. 456, Comment (c), Illus. 2, and Sec. 457. The principles of the Restatement have been variously applied in the following cases: *Wischhusen v. Spirits Co.*, 163 Md. 565, 572 *et seq.; Fast Bearing Co. v. Precision Development Co.*, 185 Md. 288, 307 *et seq.; State v. Dashiell*, 195 Md. 677, 639 *et seq.; Baltimore Luggage Co. v. Ligon*, 208 Md. 406, 417 *et seq.*

It was the appellants who asserted that they had been relieved of their liability under the lease and who had the burden of persuading the court that Ordinance No. 711 of 1953 produced the result that they claim — that the use of the leased premises for a professional office was impossible in fact. The appellants offered neither witnesses nor other evidence requiring such a finding. . . ." 210 Md. at 135-36, 122 A. 2d at 559-60.

After pointing out that "It could not be said in any case, until the [zoning] board had acted, and then the courts, on appeal had acted, whether or not a particular residential premise could or could not be used . . . ." the Court stated further:

"We think that Dr. McNally, . . . could not stand idly by and, because of a notice to that effect from an administrative official, gladly accept as a fact that his use of the office was illegal. Before he can say that the use of the premises as professional

offices by him was impossible, he was under an obligation, . . . to establish a right to continue that use, or at least to wait until impossibility became a fact, not a mere possibility." 210 Md. at 137, 122 A. 2d at 561.

Citing with approval the holdings in *Shedlinsky v. Budweiser Brewing Co.*, 163 N. Y. 437, 57 N. E. 620 (1900), the Court concluded that one may not rely on invalidity where the doing of that which is said to be forbidden may reasonably be made legal and possible through either administrative or judicial action.

Although in *McNally* the appellant "stood idly by" and accepted a notice from the Building Inspector as a fact that his use of the office was illegal in support of his position of "impossibility of performance," we see no valid reason why those same legal principles are not here applicable to St. Luke's since it equally "stood idly by" upon the opinion of its attorney that its contemplated use of the premises would be in contravention of the restrictive covenant. Thus, St. Luke's, like McNally, not having challenged the *ex parte* injunction, relied upon a "mere possibility" of the illegality of its use and did not fulfill its obligation in establishing, by litigation, the fact of the impossibility of its contemplated use.

In accord with the view that prevention of the use of the premises for the purpose contemplated by the lease may serve to excuse performance, but that the one asserting the defense must prove the existence of that prohibition, *see* 49 Am.Jur.2d *Landlord and Tenant* § 269 (1970). *See* generally Annot., *Contract-Performance-Impossibility*, 84 A.L.R.2d 12 (1962).

The appellant's citation of *Perry v. County Board of Appeals*, 211 Md. 294, 127 A. 2d 507 (1956), for the proposition that the lease became "voidable" upon service of the "injunctive order" seems to be misplaced. In *Perry* this Court, in affirming the action of the Board of Appeals for Montgomery County when it granted a special exception for the operation of a "care home" on property zoned residential

and located in Section 3 of the Village of Chevy Chase, held that the Board had properly made its determination under the zoning ordinance without reference to restrictive covenants binding the land. Rejecting the contention that the Board had no authority to grant a use of land that would violate restrictive covenants binding the land, Judge Hammond, who delivered the opinion for the Court, stated:

"Montgomery County Code, 1955, Chap. 107, Sec. 4, provides that the zoning ordinance shall not be deemed to interfere with or abrogate or annul, or otherwise affect, any covenants or other agreements between parties. This part of the zoning ordinance does not say, nor should it be taken to mean, that the rest of the ordinance must not be administered and decisions made under it, solely on the basis of its own provisions. The ordinance does not override or defeat whatever private rights exist and are legally enforceable, but neither is it controlled in its workings or effects by such rights. The enforcement of restrictive covenants is a matter for the exercise of the discretion of an equity court in the light of attendant circumstances. Many times the covenant relied on may not have been originally effective or for many reasons, may have ceased to be effective at the time relief is sought.

\* \* \*

'Such private restrictions controlled by contract and real estate law are entirely independent of zoning and have no proper place in proceedings of this character, notwithstanding if in a proper proceeding the restrictions contended for are shown to be binding upon the properties mentioned, zoning cannot nullify them.' We hold that the Board of Appeals was right in making its determination without reference to the restrictive covenants. Neither its action nor our approval of that action would have any effect on the decision in

a proceeding in equity to enforce the covenant." 211
Md. at 299-300, 127 A. 2d at 509.

Although the holdings in *Perry, supra,* might be
considered as authority for the proposition that had a
"special exception" been granted to St. Luke's such zoning
action would have no effect upon the enforcement of the
restrictive covenant, we do not read it, as has the appellant,
as holding that the issuance of the *ex parte* injunction
rendered the lease "voidable."

Nor does appellant's reliance upon *Schwartz v.
Westbrook,* 154 F. 2d 854 (D.C. Cir. 1946) and *Lalekos v.
Manset,* 47 A. 2d 617 (D.C. Mun. Ct. App. 1946) change the
result we reach. Both cases are cited as authority for the
contention that Mrs. DiGiulian's alleged failure to inform
Mrs. Henrickson and Dearden of the existence of the
restrictive covenant and her failure to defend the *ex parte*
injunction constituted a breach of her implied warranty of
quiet enjoyment. Our reading of *Lalekos* does not establish
it as authority for the proposition the appellant urges; it
held that in the District of Columbia there is in every lease
an implied warranty of quiet enjoyment and there may be a
breach of the lease by the lessor's agreement to rent the
entire premises to a tenant but only put the lessee in
possession of part of the premises because the remainder
was occupied by a sub-tenant under a prior lease.

In *Schwartz* the defendant, as lessor, had entered into a
contract with the plaintiff to construct for the plaintiff a
restaurant building and to lease it to him for a ten-year
period. In reliance thereon the plaintiff had spent
substantial funds in the purchase of equipment and fixtures
to be used in the contemplated restaurant. Because of a
restrictive covenant in his deed prohibiting the use of the
property for any commercial purposes the defendant was
unable to construct the building and deliver it to the
plaintiff. In reversing the case, for a proper award of
damages, the United States Court of Appeals recognized
that when the defendant entered into the contract "he
impliedly warranted his title to the property and that the

lessee would have quiet possession," and that it was not incumbent upon the plaintiff to search his lessor's title.

Assuming, without here deciding, that the holdings in *Schwartz* would be followed by this Court in an action between lessor and lessee — although our research has disclosed no such prior decision by this Court — its holdings are factually here inapplicable since the lessee there proved — a fact which St. Luke's has not here proved — that the proposed use of the leased premises was actually factually impossible.

Although, like the trial court, we may not here speculate on what the result may have been had St. Luke's undertaken to contest the issuance of the injunction, we agree, upon the record before us, that St. Luke's has failed to establish, as a matter of law, a factual "impossibility of performance" under the lease.

> *Judgment of the Circuit Court for Montgomery County affirmed; appellant to pay costs.*