## FOODMAKER, INC. *v.* WILLIAM B. DENNY ET AL.

[No. 945, September Term, 1975.]

*Decided July 26, 1976.*

The cause was argued before █ORTH, C. J., and MORTON and THOMPSON, JJ.

*David B. Rudow* and *Bennett Gilbert Gaines* for appellant—cross-appellee.

*David M. Blum* and *Sheila J. Carpenter*, with whom was *Richard S. Sokolov* on the brief, for appellees — cross appelants.

THOMPSON, J., delivered the opinion of the Court.

Foodmaker, Inc., operator of Jack-in-the-Box restaurants, formerly Checkerboard Properties, Inc., (Foodmaker), the appellant and cross-appellee, brought a suit at law in the Superior Court of Baltimore City against William B. Denny, Avrum K. Rifman and The Title Guarantee Company [1] for compensatory and punitive damages resulting from an alleged breach of contract for the sale of real property. Denny and Rifman countered by bringing an action in equity against Foodmaker in the Circuit Court of Baltimore City for specific performance of the contract. Pursuant to a stipulation among the parties that the evidence presented at trial would serve as the basis for an entry of a judgment at law and a decree in equity, the case was tried in the Circuit Court of Baltimore City. Prior to trial it was learned that George Goldberg was an additional owner of the subject property and his name was added as a defendant in the case at law and complainant in the equity case. On August 1, 1975, a final judgment in favor of the defendants in the Superior Court and a final decree for specific performance in favor of the complainants in the Circuit Court were entered. Foodmaker appeals contending that a denial of sign permits constituted the failure of a condition precedent entitling it to cancel the contract, and even if Foodmaker is found to have

1. The Title Guarantee Company is a party as holder of $20,000 in escrow.

breached the contract, the appropriate remedy is the effectuation of a liquidated damages clause in the contract, not specific performance. The appellees cross-appeal contending that once they had been awarded specific performance of the contract they were entitled to interest as a matter of law.

During the late summer of 1969 Robert A. Parma, agent for Foodmaker, and Denny, who had authority to deal with the subject property as he saw fit, entered into negotiations for the sale of the property located at 414-418 W. Fayette Street in Baltimore City. The property is owned by Denny, Rifman, and Goldberg as partners. It is improved by a three-story building, leased on the first floor to the U.S. Post Office, and to commercial tenants on the second and third floors. These tenants continued to occupy the premises at the same rentals through the date of trial.

During the course of the negotiations leading up to the execution of the contract, Foodmaker's agents explained to Denny the concept behind a drive-through restaurant. He was also shown a brochure containing drawings of the various aspects of the restaurant. Included in this were drawings of freestanding signs used to advertise the place and its menu. The testimony showed that Denny was completely indifferent about these plans since he was primarily concerned about the purchase price. A purchase price of $198,000.00 was finally agreed upon.

A rider to the contract was executed in September, 1969. The sections relevant to this appeal are as follows:

> "2. This Contract is contingent upon Purchaser's ability to obtain building and sign permits plus site and driveway use for a typical Jack-in-the-Box restaurant within 120 days. Purchaser shall use diligence in pursuing the acquisition of the permits and site use, however, Purchaser may withdraw from this transaction and be released of all liability hereunder should said permits be denied.

> "5. Seller hereby covenants and agrees to deliver full possession of the subject property to Purchaser

as of close of escrow free and clear of any and all lessees, tenants and/or other occupants.

"7. When all contingencies set forth in this Contract and Rider, except those set forth in Paragraph 5 above, have been met and satisfied, Purchaser agrees to so notify Seller. Upon receipt by Purchaser thereafter of written notice from Seller that all tenants have vacated the subject property and that Seller is in a position to comply with the provisions of Paragraph 5 above, Purchaser shall deposit the balance of closing funds into escrow and instruct escrow agent to close escrow within 10 days after said receipt of said notice from Seller. In the event of Purchaser's failure to comply with the foregoing within said 10 day period and the failure of said escrow to close within said 10 day period through fault of Purchaser, escrow agent shall and is hereby authorized to disburse Purchaser's deposit of $20,000.00 to Seller as liquidated damages and thereupon this agreement and any escrow agreement pursuant hereto shall cease and terminate and be of no further force nor effect and all rights and obligations of the parties hereto and of any party claiming under either of them against the other party hereto shall likewise cease and terminate."

Pursuant to this agreement Foodmaker obtained the necessary permits with the exception of sign permits. Belsinger Sign Works, Inc. of Baltimore was hired as a subcontractor to procure, among other things, the necessary sign permits. Harry Belsinger, President of Belsinger Sign Works, Inc. and member of the three-man Baltimore City Commission on Signs, informed Foodmaker that in his opinion the desired freestanding sign permits were prohibited by City Ordinance No. 663 which gave the Commission on Signs its power, and which at that time stated:

"(e) *Unlawful signs.* It shall be unlawful, within

the area described, (1) for any commercial sign, billboard, or other advertising structure or device to project outward from the primary surface of the building to which it is attached for a distance of more than 12 inches. The commercial sign, billboard, or other advertising structure or device shall be single-faced and shall not project above the top of the vertical wall of the building to which it is attached; (2) to erect any flashing, animated, or rotating signs; (3) for any commercial sign, billboard, or other advertising sign or device to be permitted or erected on the roof of any building; (4) for any commercial sign, billboard, or other advertising structure or device to be painted on any exterior wall of a building except as a substitute for a sign on the primary facade of said building."

Because of a delay in the procurement of these permits an extension until January 5, 1970 was granted to Foodmaker by Denny. On February 19, 1970 the freestanding sign permit was rejected by the Baltimore City Department of Housing and Community Development. An appeal was taken to the Commission on Signs where it was also rejected.

On March 3, 1970 Foodmaker notified Denny of its intention to cancel the contract because of its failure to obtain these sign permits. From Denny's refusal to release Foodmaker from the agreement and return a $20,000.00 deposit these actions were initiated.

In *Chirichella v. Erwin*, 270 Md. 178, 182, 310 A. 2d 555 (1973), the Court of Appeals stated that:

"A condition precedent has been defined as 'a fact, other than mere lapse of time, which, unless excused, must exist or occur before a duty of immediate performance of a promise arises,' 17 Am. Jur. 2d, *Contracts*, § 320. Similar definitions may be found in *Bergman v. Parker*, 216 A. 2d 581, 583 (D.C. App. 1966); *In Re Roberts' Estate*, 190 Kan. 248, 373 P. 2d 165, 171 (1962); Corbin, *Conditions in the Law of Contract*, 28 Yale L.J. 739,

747 (1919); 1 *Restatement of Contracts,* § 250 (1932); and 3A Corbin, *Contracts,* § 628 (1960). The question whether a stipulation in a contract constitutes a condition precedent is one of construction dependent on the intent of the parties to be gathered from the words they have employed and, in case of ambiguity, after resort to the other permissible aids to interpretation, 17A C.J.S. *Contracts,* § 338; *see United States v. Schaeffer,* 319 F. 2d 907, 911 (9th Cir. 1963), *cert. denied,* 376 U. S. 943, 84 S. Ct. 798, 11 L.Ed.2d 767 (1964).

It is clear that Foodmaker entered into the contract for the purpose of operating a profitable restaurant and that a quick-food restaurant cannot be operated properly without sufficient advertising by means of signs. Without first obtaining permits for suitable signs, Foodmaker had no intention or duty to complete the purchase of the site in question. This was expressly stated in the contract.

There was testimony that this particular site was unacceptable without a full complement of freestanding signs because it was at the convergence of two one-way streets. Visibility is poor for traffic proceeding west on Fayette Street and only fair for traffic proceeding north on Paca Street. The concept behind this type of restaurant and the procedure used by a potential customer is directly related to the signs. An approaching motorist would initially observe a freestanding pylon sign either cube or pancake shaped on which the words "Jack-in-the-Box" appear and usually having a rotating clown's head on top. The purpose of this sign is essentially advertising. The customer would then drive under a sign that says "drive through" which essentially directs the customer where to go. Next he would come upon a freestanding illuminated, menu board which allows him to choose what he wishes to order. He would then drive to a freestanding, illuminated clown's head containing a microphone and speaker bearing the words "Jack Will Speak To You" and place his order. Finally he would drive to the pick-up window where he would get and pay for his order and then drive off. It was further testified that it is

extremely critical for a business which is vehicular oriented to have the complete sign package in order "to identify, to locate, to advertise and to create the entire image" that the restaurant was attempting to project. In this respect the freestanding pylon sign, freestanding menu sign, and freestanding speaker box are considered mandatory and freestanding directional signs are considered desirable.

The real issue in this case surrounds the ambiguous phrase, "sign permits . . . for a typical Jack-in-the-Box restaurant . . .". The question is whether by use of the word *typical* the parties meant *freestanding*. If they did and Foodmaker diligently pursued this, then a duty of performance never arose, but if they did not then Foodmaker has breached the contract.

Some of the basic rules of contract interpretation were expressed in *Canaras v. Lift Truck Services, Inc.*, 272 Md. 337, 352, 322 A. 2d 866 (1974):

> "The court in interpreting a contract places itself in the same situation as the parties who made the contract, so as to view the circumstances as they viewed them and to judge of the meaning of the words and the correct application of the language to the things described. *Sorensen v. J. H. Lawrence Co., supra.* If the language under consideration is ambiguous or uncertain the court must then determine the intention of the parties. In such a case the court may consider evidence of extrinsic factors, *i.e.*, negotiations of the parties, the circumstances surrounding execution of the contract, the parties' own construction of the contract and the conduct of the parties. *See Mascaro v. Snelling & Snelling*, 250 Md. 215, 229, 243 A. 2d 1, 8, *cert. denied*, 393 U. S. 981 (1968)."

The lower court in its finding of fact stated that during the course of the negotiations Denny was shown the brochure containing pictures and drawings of the freestanding signs. It found, however, that Denny was never specifically told what a *typical* Jack-in-the-Box restaurant was and that this

*typical* restaurant necessarily includes freestanding signs; and therefore there was no meeting of the minds that freestanding sign permits were a condition precedent. We find that this conclusion is not supported by the evidence.

The testimony shows that Foodmaker considered freestanding signs to be necessary to the success of the restaurant at the location in question. During the negotiations pictures of the freestanding signs were offered to Denny. Whether he actually looked through the brochure or not is not the controlling factor. The reason that Denny did not acquaint himself with what Foodmaker meant by *typical* Jack-in-the-Box restaurant signs is that it made no difference to him. The only thing that Denny had to do to understand what was meant by the word *typical* was to observe what was presented to him. He certainly had the capacity to understand, and thus in the absence of fraud, duress, or mutual mistake his signature binds him to the reasonable interpretation of the word as long as Foodmaker did not know or was not on notice that Denny did not intend what his words and acts indicated. *Canaras v. Lift Truck Service, supra* at 344; *Binder v. Benson*, 225 Md. 456, 461, 171 A. 2d 248 (1961). By showing Denny pictures of freestanding signs, it is obvious Foodmaker meant, and reasonably so, that freestanding signs were necessary for a typical restaurant. There is nothing to indicate that Foodmaker realized that Denny understood anything different.

The trial judge relied on the fact that the brochure contained pictures of both six-by-six and eight-by-eight freestanding signs. To him this indicated that Foodmaker did not have an exact sign that was typical and therefore there was no such thing as a typical sign. The fact remains, however, that whether the dimensions of the sign were six-by-six or eight-by-eight the signs described were still freestanding. The freestanding aspect of the signs is typical. There was also evidence presented that at the time of trial there was one Jack-in-the-Box restaurant located at the corner of Broadway and Orleans Streets, that does not have freestanding signs. The testimony shows, however, that the sign permit, granting freestanding signs, was withdrawn by

the City after the site had been purchased and construction of the restaurant substantially completed. The fact that only one restaurant, among several, in the Baltimore area does not have a freestanding sign and the reason for that being that the permit was withdrawn, shows that the freestanding sign is typical. Further testimony revealed that Foodmaker will vary their signs to meet local ordinances and restrictions. This explains the differences in the size and shape of the signs, but the fact remains that Foodmaker has never waived the freestanding aspect of the sign prior to purchase of the site for a typical restaurant.

A second area in which we cannot agree with the trial judge is his finding that even if the lack of freestanding sign permits was the failure of a condition precedent, it was so minute that Foodmaker could not justly rely thereon for rejection. If it were important enough to be made an express condition, then it is obvious that the parties did not consider it so minute that its failure would not justify a rejection.

The third question is whether Foodmaker exercised due diligence in its attempt to obtain the sign permit. In assessing this issue the trial judge found that Denny had waived the "time is of the essence" clause of the contract by granting Foodmaker an extension of time to procure the necessary permits. We fully agree with that finding. *Allview Acres, Inc. v. Howard Investment Corp.*, 229 Md. 238, 182 A. 2d 793 (1962). Since the time of the application is not the issue, the question becomes whether the sufficient channels were pursued in good faith.

In *Mayor and City Council of Baltimore v. Mano Swartz, Inc.*, 268 Md. 79, 299 A. 2d 828 (1973), the Court of Appeals ruled that Ordinance 663 was unconstitutional. A legislative act, however, is strongly presumed constitutional. *Md. Board of Pharmacy v. Sav-A-Lot, Inc.*, 270 Md. 103, 106, 311 A. 2d 242 (1973). The fact that Foodmaker did not challenge the constitutionality of the ordinance cannot be considered a lack of diligence.

Similarly, we see little merit to the contention that a simple reading of the ordinance reveals that there is no

prohibition against freestanding signs. Foodmaker followed the appropriate channels to determine whether there was such a prohibition. It filed its application with the proper agency which was denied. An appeal was taken to the Commission on Signs and rejected. It is obvious some people did not find the ordinance so simple.

"What will constitute reasonable efforts under a contract expressly or impliedly calling for them is largely a question of fact in each particular case and entails a showing by the party required to make them of 'activity reasonably calculated to obtain the approval by action or expenditure not disproportionate to the circumstances.' " *Allview Acres, Inc. v. Howard Investment Corp., supra* at 244.

Relying on *Pennsylvania State Shopping Plazas, Inc. v. Olive,* 202 Va. 862, 120 S.E.2d 372 (1961), *Silverman v. Isaac Goldmann Realty Corp.,* 232 App. Div. 292, 249 NYS 505 (1931), *Allview Acres, Inc. v. Howard Investment Corp., supra,* and *McNally v. Moser,* 210 Md. 127, 122 A. 2d 555 (1956), the trial court found that Foodmaker had not exercised due diligence, and therefore could not avoid its responsibilities under the contract. We find that the cases do not support this conclusion.

In *Pennsylvania State Shopping Plazas, Inc. v. Olive, supra,* the appellee agreed to sell a tract of land to the appellant if the appellant would construct a service station consisting of at least 2,000 square feet of building and pumps, on a portion of the premises and lease it back to the appellee. The Court found that where the appellant made no effort to fulfill its obligation for almost two years and then only attempted to obtain a building permit "to construct a station on 2,000 square feet without considering set-back lines and disclosing the driveways and parking areas around the station were to be used in connection with it" the appellant had not made a bona fide effort to perform.

In *Silverman v. Isaac Goldmann Realty Corp., supra,* the

landlord leased a building to be used as a garage after the landlord in concert with other property owners had several months before made an application to have the area rezoned to a classification which would have prevented this. The landlord claimed he had discharged his duty to procure a permit by filing plans with the building department. The Court found that this was not enough. It went on to add, however, what steps may have constituted due diligence. The landlord could have taken steps to withdraw the application for rezoning; having purchased a large quantity of property in the area, he could have undertaken to secure a sufficient percentage of other owners to obtain a variance; or he could have applied to the board of standards and appeals for a variance.

In *Allview, supra,* the Court found that a seller had made reasonable efforts to obtain a change of zoning of land contracted to be sold subject to the condition precedent that such reclassification be obtained. As we point out later, in making its determination, the Court looked at the original settlement date to determine the intent of the parties as to the efforts necessary to show a reasonable effort by the sellers to obtain the necessary zoning. It went on to state that there was no argument that the sellers' efforts lacked reasonableness because of a failure to appeal the Circuit Court judgment and in the absence of such, the failure to appeal does not affect the reasonableness. Contrary to appellees' contention we do not find that the Court held that due diligence requires an appeal if at some later time an argument of merit is established. That question is left to the facts and circumstances of the particular case.

In *McNally v. Moser, supra,* a tenant attempted to terminate his lease. When he was informed by the landlords that they intended to keep the lease in effect, the tenant wrote to the building inspector asking whether his use of the premises complied with the zoning laws. Upon learning that it did not, he made no effort either on his own or through the landlords (he failed to even disclose this fact to the landlords) to obtain official permission to continue use of the premises. The Court found that having brought about the

challenge to the use in order to escape his duties under the lease he could not idly stand by and gladly claim that his use was illegal. The Court did not as much as hint that a judicial challenge was required.

The facts in the case at bar show that Foodmaker applied to the appropriate administrative agency to obtain the permit. Upon rejection an administrative appeal was turned down. The evidence shows that the policy of the Commission on Signs was to turn down all freestanding sign applications. There is no evidence to show any wavering on this position. To obtain these permits a local sign company and a member of the Commission on Signs was hired.[2] It is not questioned that qualified people were hired. All the evidence shows that Foodmaker obtained every other permit necessary and spent a substantial sum of money in attempting to obtain these permits and in obtaining a preliminary title report and a current survey of the property. Contrary to the cases relied on by the trial judge, the evidence shows that Foodmaker was not trying to find ways to escape from the contract but was diligently trying to obtain the necessary permits.

The appellees argue that because Foodmaker did not seek judicial action to obtain the permits shows a lack of diligence. They say Foodmaker was required to take the necessary judicial or administrative action to obtain the permits since the signs could not be erected without them. *McNally v. Moser, supra.* If at the time of the signing of the contract both parties felt that both judicial and administrative channels should necessarily be pursued, then Foodmaker would have been required to so perform. The contract states that diligent efforts could be made within 120 days. The 120 day time limit, while found to have been waived, is persuasive to show the intent of the parties at the time of the execution of the contract was that administrative procedures alone constituted due diligence, since both administrative and judicial procedures could not have been

---

2. We make no comment on the conflict of interest but recite that a member of the Commission was hired to procure the permit only to show the desire of the buyer to obtain the permit.

concluded within the time limit.[3] *Compare St. Luke's House, Inc. v. DiGiulian,* 274 Md. 317, 336 A. 2d 781 (1975), where judicial actions were the appropriate procedure to test a restrictive covenant. For these reasons we find that the trial judge erred in his finding that Foodmaker failed to pursue diligently the obtaining of the permits.

Because we have found that the condition precedent was not met, no duty of performance arose as to Foodmaker and under paragraph 7 of the rider it is entitled to recover its $20,000.00 deposit. As we reverse the decree for the specific performance we do not reach the other questions.

> *Decree of specific performance reversed.*
> *Judgment in law case entered in favor of Foodmaker, Inc. for $20,000.00.*
> *Appellees to pay costs.*

3. "The facts that the settlement date was not treated as binding by either side, and that no point was made of it here or in the trial court do not, of course, detract from this view of the intent of the parties at the time the contract was signed, which is the relevant intent on this phase of the case." Allview Acres v. Howard, supra at 245.