711 A.2d 1330

## INFORMED PHYSICIAN SERVICES, INC.

### v.

## BLUE CROSS AND BLUE SHIELD OF MARYLAND, INC.

**No. 130, Sept. Term, 1997.**

Court of Appeals of Maryland.

June 26, 1998.

Reconsideration Denied July 28, 1998.

Mark J. Hardcastle (Terry B. Blair, Blair & Hardcastle, P.A., Baltimore; Thomas F. McDonough, Royston, Mueller, McLean & Reid, L.L.P., Towson, all on brief), for Appellant.

Kathleen A. Birrane (James P. Ulwick, Kramon & Graham, P.A., on brief), Baltimore, for appellee.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER and CATHELL, JJ.

WILNER, Judge.

This appeal arises from the demise of an endeavor known as the Select Advantage Network (SAN), developed in 1990 by Blue Cross and Blue Shield of Maryland, Inc. (BCBS). Appellant, InforMed Physicians Services, Inc. (InforMed), sued BCBS in the Circuit Court for Baltimore County for injunctive relief and to recover some $16 million in compensation that it contended BCBS owed to InforMed or to physicians represented by InforMed as a result of the SAN program. The court granted summary judgment in favor of BCBS, and InforMed appealed. We granted *certiorari* prior to argument in the Court of Special Appeals and shall affirm the judgment entered by the circuit court.

## BACKGROUND

In 1990, BCBS provided insurance for about 1.4 million Marylanders. About one million of its subscribers had some form of indemnity plan; the other 400,000 were in health maintenance organizations. Traditionally, at least with respect to group indemnity plans, BCBS used the "usual, customary, and reasonable" (UCR) method of paying health care

providers for the covered services provided to BCBS subscribers. We described that method in *Insurance Comm'r v. Blue Shield,* 295 Md. 496, 501–02, 456 A.2d 914, 917–18 (1983). Briefly, BCBS would determine, for each provider, the fees most frequently charged by that provider for each covered service; that became the "usual" profile for that provider for that service. BCBS would then develop a composite of the various "usual" profiles and, using a weighted system based on the total number of claims, calculate the "customary" profile for that service. The "usual" profiles were arrayed from high to low, and the level at which 90% of the claims would be paid in full became the "customary" profile for the service. As we indicated in *Insurance Comm'r,* "[o]rdinarily, the amount paid by a plan for a particular service will be the lowest of the provider's submitted charge, his usual profile, or the customary profile." *Id.* at 501–02, 456 A.2d 914.

In an effort to control the escalating costs of health care coverage, BCBS, in the mid–1980's, developed "preferred provider" plans, under which it afforded a higher level of reimbursement to the subscriber for a covered service if the subscriber was treated by a physician who was a member of the "preferred provider network," *i.e.,* a physician who agreed to accept a discounted amount for services provided to plan members and to refer subscribers only to physicians in the network. As of 1990, a typical preferred provider contract provided that the health care provider would accept as "payment in full for covered services 90% of [BCBS]'s Usual, Customary, and Reasonable (UCR) payment methodology."

BCBS is a non-profit health service plan, as defined in then-Maryland Code, Article 48A, § 354 (current § 14–102 of the Insurance Article (1997)), and, until 1996, was prohibited from amending "the terms and provisions of contracts executed or to be executed" with health care providers "until such proposed amendments have been first submitted to, and approved by, the Insurance Commissioner." *See* former Article 48A, § 356 (1994 Repl.Vol.). Any contractual change in the method of reimbursement to health care providers thus had to be

submitted to and approved by the Insurance Commissioner. *See Johns Hopkins Hosp. v. Insurance Comm'r,* 302 Md. 411, 413, 488 A.2d 942, 943 (1985); *Weiner v. Maryland Ins.,* 337 Md. 181, 652 A.2d 125 (1995).

In late 1990, BCBS began to develop a more refined system of "credentialed" provider networks, which became known as the Select Advantage Network—the SAN. It was directed at physicians practicing in 20 designated specialties. The objective of the SAN was to recruit selected physicians in each of the 20 specialties who would agree to provide certain statistical data regarding the frequency and costs of services provided by them, to submit to evaluative site visits, and to permit their medical records to be reviewed for content, format, and appropriateness. The data would be analyzed, and each physician would be informed of the comparison between his or her procedures and practices and those of other Maryland physicians in the same specialty. The theory was that, with this knowledge, the physicians would develop more efficient approaches to managing health care. The program was envisioned as part of a more general movement to assure better quality in medical service and "to start winnowing down the gross numbers of providers in the marketplace that are being insured to those that can have demonstrated quality and effectiveness." Key to the recruitment of the physicians, who would be burdened with the additional administrative work, was the prospect of a higher level of payment for the medical services they provided to BCBS subscribers.

The SAN approach called for the site visits and clinical evaluations to be done by BCBS, but for there to be an independent entity to collect and analyze the data submitted by the physicians and to render general reports to BCBS and individual ones to the physicians. BCBS therefore envisioned three sets of contractual relationships—one between BCBS and the selected physicians, one between the third party and the physicians, and one between BCBS and the third party governing, among other things, compensation for the data

collection and analysis service.[1]

The initial proposed contract between BCBS and the recruited specialists required the doctors, subject to certain conditions, to allow BCBS's agent access to data identified as necessary to evaluate the effectiveness and efficiency of the doctor's practice and to cooperate with BCBS's efforts to develop and conduct "utilization review activities." The contract called for a one-year continuation of the current level of reimbursement at 90% of UCR, but provided that, for subsequent years, BCBS would "adjust its calculation of UCR for selected procedures, resulting in an increase in compensation for qualifying physicians." Qualification for the adjustment would be determined by an index based on the efficiency of the physician's practices and procedures. Paragraph 11 of the contract provided that, after December 31, 1992, either party could terminate the contract upon 60 days notice. We are informed that, at some point prior to October, 1992, that contract was submitted to and approved by the Insurance Commissioner.[2]

Initially, BCBS selected the Barton–Gillet Company, which had an existing contractual relationship with the Medical and Chirurgical Faculty of Maryland, to serve as the third party liaison with the recruited physicians, and, in 1990, an agreement was signed between BCBS and Barton–Gillet. In March, 1992, a new company, InforMed, was chartered, and

---

1. A companion effort, which was not itself part of SAN, was directed at primary care physicians. The details of that effort are somewhat sketchy in the record and come mostly from comments made by a BCBS spokesman at an informational hearing before the Insurance Commissioner, but it appears that those physicians also would be recruited and placed under a separate agreement with BCBS. Under that agreement, the doctors would be expected to submit to site visits and provide certain information to the third party, and, as an incentive to participate, those who otherwise participated in the preferred provider network would receive 100%, rather than 90%, of the UCR for the services they rendered under the new program.

2. The only evidence in this record of that submission and approval was a statement by a BCBS spokesman. He identified the submission only as NS816.

the rights and obligations of Barton–Gillet under the agreement with BCBS were assigned to InforMed. Under that agreement, BCBS was to use its best effort to enroll 2,500 primary care and specialist physicians in the SAN and companion program for primary care physicians, to provide data to InforMed from the BCBS claims history files, and to pay InforMed $162,000 for its services in 1992.

In March, 1993, a new contract was signed between BCBS and InforMed. According to a January, 1994 internal BCBS memorandum written by Debora Craig, Director of Networks Management, the new contract "differed greatly" from its predecessor. Indeed, it marked a major change in the fiscal aspect of the program. For one thing, rather than continuing in effect the current UCR rate of reimbursement for a year and then making indexed adjustments in the future, the contract obligated BCBS to "commit $3.5 million to fund incentive adjustments in the reimbursement profiles of specialty physicians who satisfy [BCBS] selection criteria and who are willing to participate in the InforMed feedback loop." [3] Those adjustments were to be in the form of a single incentive adjustment, to be implemented at the *beginning* of the SAN contract period, with subsequent incentive adjustments to the SAN physicians' reimbursement profiles to be dependent on the continuing ability of those physicians to demonstrate quality and effectiveness. The new contract also, for the first time, permitted InforMed to recover a fee *from the physicians* in the amount of 1.5% of the payments they received from BCBS. According to the Craig memorandum, that approach was taken because InforMed had not recovered its full start-up costs and "therefore had to find another way to recover expenses." The memorandum makes clear that the immediate increase in physician profiles was driven by the agreement to allow InforMed to recover part of its expenses from the physicians: "InforMed was depending on these profile increas-

---

**3.** The $3.5 million appears to have been derived from applying an aggregate 5% increase to the profiles in the 20 designated specialties against $70 million in estimated payments to recruited specialists for covered services.

es to 'soften' the blow of the InforMed fee to their physician clients, as they were collecting 1.5% of BCBS payments."

·The new BCBS–InforMed contract was to take effect January 1, 1993 and continue in effect "for 24 months *following regulatory approval of the projected adjustments in physician compensation.*" (Emphasis added.) It would then be renewed annually, subject to the right of a party to terminate on 90 days notice. As compensation to InforMed, BCBS agreed to pay $19,167 per month for consultation services and $15,000 per month for providing feedback services to the physicians.

On October 6, 1992, in conformance with its undertaking in the new contract with InforMed, BCBS unilaterally changed the arrangement with the recruited physicians. In a letter to the physicians, BCBS noted that the promised adjustment to their profile was to take place "when the effectiveness and efficiency of the SAN network could be documented by InforMed" but advised that BCBS had decided to "accelerate the timing of our planned increase" in accordance with an attached schedule. That schedule, BCBS stated, would provide the physician "with at least a 5% increase in revenue for your care of [BCBS] patients" and would be implemented in about 14 days. Nothing was said in that letter about the physician having to pay a 1.5% fee to InforMed.

It appears that, during this period of time, BCBS had a number of informal meetings with the Insurance Commissioner's staff regarding the SAN program. Associate Commissioner Donald Brandenberg later noted that, in early October, 1992, BCBS and the staff "discussed several form filings" related to the SAN program, that the Insurance Division had also received some inquiries from physicians concerning adjustments to the profiles, and that a meeting was held in late October to discuss the relationships between BCBS, InforMed, and Barton–Gillet, the SAN program, and the funding mechanisms that would be required to implement that program. Mr. Brandenberg, stated that, in November and December, various communications "addressed the need for the Division's

approval of the changes being proposed for the physician profiles."

The change made by BCBS in its arrangement with the physicians, consistent with the commitment it made in the 1993 agreement with InforMed, was obviously significant. Whereas the initial contract approved by the Commissioner kept the profile at 90% of UCR for the first year and provided for an undetermined index adjustment thereafter, the new arrangement appeared to call for an immediate 5% increase in reimbursement. As indicated in the Craig Memorandum, the money necessary to fund that immediate increase was to come from a 3% general increase in profiles, which would require approval by the Commissioner. An application for approval was expected to be filed in the spring of 1993, to take effect June 1, 1993. On or about December 18, 1992, BCBS sought separate approval by the Insurance Commissioner of the reconstituted SAN program.

On December 30, the Commissioner, through a letter signed by Associate Commissioner Brandenberg, disapproved the program "as presently proposed." Unfortunately, because the papers that BCBS filed with the Commissioner on December 18 are not in the record before us, we have no clear idea of what, in fact, was proposed; it is apparent, however, that the submission did *not* include an application for a general increase in profiles. Mr. Brandenberg gave six reasons for the disapproval: (1) the methodology for increasing payments to the selected physicians was "unwieldy and a potential boondoggle for physicians and [BCBS] service personnel to understand";[4] (2) the additional administrative

---

4. As explained later by BCBS, the proposal submitted in December was quite complex. It was not a 5% across-the-board increase to each doctor for each procedure, but was based on a computer-generated method of selecting specific procedures relevant to each individual physician and making differing adjustments for each such physician-based procedure. Some adjustments would be less than 5%, some would be greater, but an attempt would be made to achieve an overall 5% increase in their total compensation for covered services. Whether a physician would achieve that increase would depend on the amount

work for the physicians, coupled with the requirement that 1.5% of BCBS payments be remitted to InforMed, would likely negate the benefit of the additional remuneration; (3) because the actual increases in remuneration would vary by procedure and by specialty, there would be considerable problems for BCBS in determining the correct payment, explaining the process, and keeping track of administration; (4) the methodology "bears no relationship to underlying cost for each procedure other than as a mechanism, presumably, to spread an overall 5% increase across a selected limited number of specific procedures" and that arguments "for this apparent mathematical drill are not convincing to the Insurance Division"; (5) there was concern that what appeared to be administrative services from InforMed may flow through the BCBS accounting system as claims or cost of care; and (6) there was concern as to whether an intermediary such as InforMed was necessary, and BCBS would have to demonstrate why similar services could not be provided in house via BCBS's own databases. The letter concluded with the statement that the Insurance Division "is ready to further discuss this disapproval or consider your *revised* program if appropriate." (Emphasis added.)

Unfortunately, BCBS did not await approval by the Insurance Commissioner before proceeding with the program. Prior to the December 30 letter, an undetermined number of physicians had been recruited and had, in fact, signed new contracts, some as early as August, 1992. Indeed, "a former employee" of BCBS had proceeded to increase the profiles of at least 728 physicians in accordance with the revised SAN plan. For those physicians, the plan had been at least partially implemented, and it remained so, notwithstanding the disapproval of December 30, until April, 1995. BCBS continued its recruitment efforts, and, by January 12, 1993, informed the Insurance Commissioner that over 1,000 specialists and 600 primary care physicians had signed new SAN contracts.

---

of adjustment determined for each procedure and the frequency that the physician used the various procedures in the mix.

On January 12, apparently at BCBS's request, an informal meeting was held with Mr. Brandenberg to discuss the concerns raised in his December 30 letter. Later that day, BCBS, in a letter to Brandenberg, attempted to allay those concerns. It insisted that the new arrangement was well understood by both BCBS and the physicians, that the additional 5% would be "loaded into our pricing file" and would therefore be "transparent," and that an intermediary such as InforMed was necessary. In that last regard, it stated that the BCBS database was inadequate and that BCBS would be unable to access the database of the Health Services Cost Review Commission. That letter was followed by two others. On January 20, BCBS sent a one-page conclusory document estimating a savings from the SAN program of between $20 million and $48 million. Two days later, InforMed confirmed that the request was for permission "to adjust $70 million in specialist physician fees, for a total fee effect of $3.5 million." It assured the Commissioner that the increase for SAN physicians would not reduce the amount other participating physicians would receive as part of a general profile adjustment BCBS intended to request in June, 1993. None of these letters appears to contain or suggest any *revision* to the proposed program, but constituted, instead, arguments in support of the program that had been presented and disapproved and, at least inferentially, sought reconsideration of that disapproval.

In response to those and other letters that he received concerning the SAN proposal, the Commissioner caused notice to be published in the MARYLAND REGISTER of a public hearing on March 1, 1993, the hearing to be

> "an informational hearing to receive information on whether to approve a change in the usual, customary, and reasonable method (UCR) of health care provider reimbursement submitted by [BCBS] that would permit a 5 percent increase in the reimbursement provided to health care providers who qualify for participation in a proposed Select Advantage Network (SAN)."

Mr. Brandenberg, who conducted the hearing, noted at the outset that the Insurance Division had met several times with representatives from BCBS and InforMed and had heard from many other persons, that the Division had "gotten some slightly different answers on certain issues" resulting in some confusion, and that the purpose of the hearing was to get "everybody together" and "get the final version of everything."

It appears from the presentations made by BCBS that the SAN program was still evolving, and that some of the information previously supplied to the Commissioner was either incorrect or no longer valid. The BCBS representative, Mr. Sutton, indicated that only $2.5 million would be needed for profile adjustments in the current year, not $3.5 million, as initially asserted. He stated that instead of an overall profile adjustment of 4%, which had previously been expected, BCBS would be asking for only 3%. He disavowed the implication in the document accompanying the January 20, 1993 letter that the SAN profile adjustment for the primary care physicians would be allocated from the anticipated 1993 general profile adjustment, asserting instead that any adjustment for the primary care physicians would be done separately. Mr. Sutton clarified that the SAN profile increase was not going to be a straight 5% for each procedure but rather was to be an anticipated composite. In response to questions from the Commissioner's assistant chief actuary, he acknowledged that for some procedures there may be no increase at all, while for others the increase could be as much as 10%. Indeed, Mr. Sutton made clear that there was no guarantee that any physician would actually receive a composite 5% increase. In his words, "[t]hey are guaranteed that the procedures that are being identified will, are estimated on our part and with their concurrence represent *a potential* for a 5 percent increase." (Emphasis added.) He acknowledged the prospect that physicians could receive "much more than a 5 percent increase," and, in response to further questions from the actuary, that physicians might be inclined to use one procedure rather than another based on the percentage increase attached to it.

Following the presentation by Mr. Sutton, a representative from the State Department of Personnel registered an objection to the proposal. Noting that the State was the second largest account administered by BCBS, she complained that BCBS had not informed the State of its SAN plans during the 1992 contract negotiations but had represented instead that the preferred provider network was the only network it had. She expressed concern that the SAN program would undermine the preferred provider network and urged that BCBS learn to manage its present network before launching into a new one. It was later pointed out by BCBS that the State *had* been informed of the SAN program during the contract negotiations.

On March 24, Mr. Brandenberg requested certain documents and information from BCBS. In light of the fact that BCBS intended to request a general profile increase on or about May 1, he questioned whether there was any need to proceed with separate increases for the SAN program. He also asked whether the profile increases would be prospective only—for services rendered after approval—and sought actuarial documentation of BCBS's estimate of the savings to be realized from the SAN program. The letter concluded with the statement that the Insurance Division intended to "immediately address" the BCBS response and "hopefully move to a timely conclusion of these issues." BCBS responded on March 31, noting, among other things, that the filing for a general profile increase was being delayed to June 1.

On April 8, 1993, the Governor removed the incumbent Insurance Commissioner, Mr. Donaho, and replaced him with an interim Commissioner, Mr. Benton. Eleven days later, in response to an inquiry from the State Secretary of Personnel, who apparently continued to harbor objections to the proposal, Mr. Benton related his own substantial concerns about the proposal, but advised that (1) Mr. Brandenberg was "still in the process of assembling information to formulate a recommendation to the Commissioner," and (2) in light of his expectation that the Governor would name a permanent Com-

missioner shortly, he did not intend to rule "on this or any other similar request."

On May 17, BCBS filed its application for the 3% general profile increase, to become effective June 1, 1993. That application projected an increase of $14.5 million, with $2.5 million allocated to the SAN program. On May 25, Mr. Brandenberg rejected the application as "not comparable to previous profile updates" and lacking in certain information.[5] He informed BCBS that any resubmission would be subject to Mr. Benton's disinclination to rule on the SAN proposal pending the appointment of a permanent Commissioner.[6]

The May 25 letter from Mr. Brandenberg was the last official communication between BCBS and the Commissioner concerning the SAN program. Significant changes in the top management of BCBS occurred around that time, and the new management, in effect, abandoned SAN in favor of more orthodox forms of managed care. It never submitted a revised SAN proposal; it supplied no additional information concerning the proposal that had been rejected; and it never resubmitted the application for general profile increase, from which the funds for SAN were to come. In an internal memorandum dated September 29, 1993, BCBS's Director of Sales suggested that BCBS "pull the plug on SAN." A January 4, 1994 memorandum from Ms. Craig acknowledged that, following the March 1 hearing, "the SAN product was considered by many internally as DOA." She opined that the Insur-

5. A May 19 memorandum from the Assistant Chief Actuary to Mr. Brandenberg observed that "there is not enough information on which to base any action. Not only is the letter 'light on financial justification,' there is practically no financial information presented." The actuary suggested that Mr. Sutton be advised to contact the Insurance Division "to get some idea of the type of material submitted in prior years in connection with similar requests."

6. That disinclination, as noted, was expressed by Mr. Benton in his letter to the Secretary of Personnel. The letter itself does not indicate that a copy was sent to BCBS. Without citation to the record, InforMed states in its Brief that BCBS received a copy of the letter and was thus already aware of Mr. Benton's position. As BCBS does not contest that assertion, we shall accept it as correct.

ance Division "was not about to budge" but observed that no one had informed InforMed "that SAN as a product is dead." She recommended that the agreement with InforMed be terminated, noting that, in any event, "[t]here are many items in the existing agreement that have not been delivered." At some point, the President of InforMed was informed orally by BCBS that, in June, 1993, BCBS "changed its strategy" and that, as a result, "no one at BCBS supported SAN and no one was trying to get Insurance Division approval of either the SAN increase or the general profile increase." Mr. Brandenberg had some informal conversations with BCBS following the May 25 letter, but, in light of the management changes at BCBS, regarded the SAN matter as "just generally under review."

In the summer of 1994, BCBS attempted to disengage from InforMed. On July 18, its chief legal officer, Mr. Broccolino, wrote to InforMed's attorney, noting that an earlier settlement proposal had not been responded to and advising that BCBS would make only one further payment. InforMed was instructed to stop all work being done for BCBS. In December, 1994, InforMed wrote to Mr. Brandenberg, inquiring about the status of the SAN proposal. In response, Brandenberg confirmed that the original proposal "was formally disapproved via a December 30, 1992 letter" and that that disapproval "precipitated the various meetings, communications, and hearing in early 1993." With the appointment of a new Commissioner and the management changes at BCBS, it was his understanding that BCBS, aware of the Insurance Division's concerns, would "reevaluate its proposals under the developing circumstances" but that nothing more had been received from BCBS.[7]

Five days after receiving Mr. Brandenberg's response, InforMed filed this lawsuit, both in its own right and as agent

---

7. In deposition testimony, Mr. Brandenberg noted that there was concern at the time that "this was a program initiated under the reign of [BCBS's former president] and since he had left, the feeling was the new regime should have a chance to evaluate this and see whether or not it fit into whatever the new regime intended to do."

for the doctors who had been recruited for SAN, seeking (1) an injunction to restrain BCBS from terminating the increased payments being made to the SAN doctors, (2) an accounting, and (3) damages of up to $16 million for breach of contract, unjust enrichment, fraud, and negligent misrepresentation. It also, apparently, sent a letter to the various physicians who had been recruited for the SAN program, although that letter is not in the record before us. What *is* in the record is the BCBS response to that letter. On March 27, 1995, BCBS informed the physicians of its efforts to obtain approval of the SAN program. It advised, however:

> "Unfortunately, the Insurance Administration did not approve the increases proposed for the SPO/SAN delivery system, thus rendering our SPO/SAN addendum with you a nullity. Therefore, a formal notice of termination under Paragraph 11 was unnecessary. However, if needed, this letter shall serve as such notice."

In April, 1995, perhaps as a result of the suit, Mr. Broccolino informed the Commissioner that, in December, 1992, BCBS "incorrectly instituted profile increases for a number of physicians who had agreed to participate in [the] SAN program" and that BCBS was then attempting to determine how many providers had their fees adjusted. Associate Commissioner Randi Reichel responded, seeking specific information regarding the SAN program and the adjustments. On May 17, Mr. Broccolino advised that BCBS "never implemented the SAN program" but that a "former employee" had increased the profiles of 728 physicians while the request for SAN approval was pending and before the disapproval was received. He said that gathering more detailed information was difficult because none of the managerial persons who worked on the SAN were still employed by BCBS.

BCBS's initial response to the InforMed complaint was a motion to dismiss it, principally on the grounds that (1) the court had no jurisdiction to enjoin BCBS from altering its reimbursement payments, (2) InforMed had no standing to bring an action on behalf of the physicians, and (3) any enforcement of the SAN program would be unlawful, in light

of its ·disapproval by the Commissioner. The motion was granted in part and denied in part by Judge Cahill, following which an amended complaint was filed. BCBS answered that complaint and moved for partial summary judgment on the ground that, because the profile increases had never been approved by the Commissioner, any payments to the physicians under it would be unlawful.

InforMed responded that the December 30 disapproval was irrelevant. It regarded the March 1 hearing as a reconsideration of the disapproval and urged that, as the Commissioner never issued a second disapproval, the SAN program was deemed approved. That argument was based on provisions in then-Article 48A, §§ 242B(1) and 356(a) (current §§ 11–502(f) and 14–126 of the Insurance Article), which we shall discuss later in this Opinion. In summary, § 242B provided that, if a person aggrieved by a decision of the Commissioner that was made without a hearing requested a hearing, one must be held, and the Commissioner was required to affirm, reverse, or modify the previous decision within 20 days after the conclusion of the hearing. If the Commissioner failed to hold or complete the hearing or make a decision within the time specified, the filing or application "shall be deemed approved." Section 356(a) required a proposed amendment to a BCBS physician contract to remain on file with the Commissioner for 60 days, unless that time was extended, and provided that the filing would be deemed approved unless disapproved within the waiting period. The section also stated that, if the Commissioner demanded additional information regarding the proposed amendment, the waiting period would be suspended until the information was supplied. The dispute concerning § 356 was largely over whether all of the information requested by Mr. Brandenberg had been supplied, and InforMed filed a motion under Maryland Rule 2–502 for a separate determination of that issue.

Believing, in light of InforMed's argument, that whether the SAN proposal had been approved or disapproved was a question of disputed fact, the court, through Judge Turnbull, initially denied the motion for partial summary judgment.

The case was then assigned to Judge Fader, who conducted several hearings—one in July, 1996, one in June, 1997, and two in July, 1997. Like Judge Turnbull, he initially viewed the issue as being whether, for purposes of the "deeming" provisions in §§ 242B and 356, the Commissioner was still gathering information. Prior to the 1997 hearings, however, the General Assembly enacted 1996 Md. Laws, ch. 645, repealing the requirement in § 356 that amendments to BCBS physician contracts be approved by the Commissioner. The new Act became effective October 1, 1996. In light of that enactment, InforMed insisted that BCBS's illegality argument had no further basis—that the Commissioner's approval was no longer required and it was therefore not unlawful for BCBS to honor its contractual undertakings. After hearing argument, Judge Fader concluded that the 1996 Act did not apply retrospectively to contracts entered into prior to its enactment, that the Commissioner's approval was therefore necessary, that the SAN proposal had *not* been approved by the Commissioner, and that the contracts implementing the program could not be enforced. He granted the motion for summary judgment as to all counts in the amended complaint. He also denied the InforMed motion under Maryland Rule 2–502 for a separate determination of whether the application for the SAN profile increase had been approved.

## DISCUSSION

InforMed raises four issues in this appeal: (1) whether the 1996 law is a procedural, remedial measure that should be applied to the SAN profile increases in this case; (2) whether the proposed amendment to the physician profile was deemed approved under § 356; (3) whether that proposed amendment was deemed approved under § 242B; and (4) whether summary judgment should have been granted on the counts relating to (A) whether BCBS failed to make a good faith effort to obtain approval, (B) misrepresentations made by BCBS regarding its efforts to obtain approval, and (C) claims made by InforMed for its own compensation, that did not

require Commissioner approval. We shall deal with these issues *seriatim.*

## Application of 1996 Law

The principal defense offered by BCBS to the claims asserted by InforMed on behalf of the physicians was that the increase in profile upon which those claims were based required approval of the Insurance Commissioner, that the increase was never approved by the Commissioner, and that payment of the increase would therefore be unlawful. The 1996 law, repealing the requirement of Commissioner approval, according to InforMed, eliminated that defense. That might be true, however, only if the law applied to increases contracted for by BCBS in 1992.

InforMed acknowledges that, as a general rule, statutes are presumed to operate prospectively only. Indeed, as we held in *WSSC v. Riverdale Fire Co.,* 308 Md. 556, 561, 520 A.2d 1319, 1322 (1987), "[t]he presumption against retrospectivity is rebutted only where there are clear expressions in the statute to the contrary." The basis of InforMed's replication is the corollary principle, announced in *Janda v. General Motors Corp.,* 237 Md. 161, 205 A.2d 228 (1964) and confirmed in *WSSC,* that "a statute governing procedure or remedy will be applied to cases pending when the statute becomes effective." *WSSC, supra,* 308 Md. at 564, 520 A.2d at 1323. It regards the 1996 law as being procedural, rather than substantive, in nature, and it urges that, if, following the reconsideration hearing of March 1, 1993, the SAN proposal was not deemed approved under § 242B or § 356, it must still have been pending when the 1996 law took effect, for the Commissioner did not otherwise rule on the reconsideration. Accordingly, it avers, repeal of the requirement of approval was effective and allowed BCBS to proceed with its contractual commitment.

The simple answer to that defense is that, quite apart from any notion of deemed approval, the issue was *not* pending before the Commissioner and there *was* no existing con-

tractual commitment when the 1996 law took effect. It is clear, beyond cavil, that both BCBS and the Insurance Commissioner regarded the SAN proposal as disapproved and effectively abandoned long before October 1, 1996.[8] There can be no doubt that the filing made on December 18, 1992 was formally disapproved on December 30. It is also clear that the general profile increase, from which the SAN increases were to come, was formally disapproved on May 25, 1993, and that no further filings were made with respect to either proposal. All of the evidence, uncontradicted, shows that the new management of BCBS abandoned the entire SAN program in 1993 or 1994. In July, 1994, BCBS terminated its contract with InforMed, and in March, 1995, it formally terminated the new contracts it had entered into with the doctors. Thus, even if the 1996 law could or should be applied retroactively, there was nothing left to which it could apply. Both when the contracts were entered into and when they were terminated, the Commissioner's approval for profile increases was required and had not been obtained.

### Deemed Approved Under § 356

Article 48A, § 356(a), as noted, prohibited BCBS from amending the terms and provisions of contracts executed or to be executed with physicians until the amendment had "first been submitted to, and approved by, the Insurance Commissioner." Each amendment, it stated, was to remain on file with the Commissioner "for a waiting period of 60 working days before it becomes effective." The statute then provided, in relevant part:

---

8. InforMed itself acknowledged that status. In ¶ 46 of its complaint, InforMed noted Mr. Brandenberg's December 30, 1992 letter disapproving the proposal as submitted. In ¶¶ 59 and 60, it averred that BCBS and the Insurance Division agreed that BCBS would "resubmit its proposal to the new Commissioner and request approval" but that "[n]o such resubmission or request for approval was ever made by BCBS...." Although in ¶¶ 58 and 60, it alleges that there was some kind of indefinite stay of proceedings, it gives no indication of what was left for the Commissioner to rule upon. The one submission had been formally disapproved and there never was another submission.

"When in the Commissioner's opinion an amendment is not accompanied by the information needed to support it and the Commissioner does not have sufficient information to determine whether the filing meets the requirements of this section, the nonprofit health service plan shall be required to furnish the needed information and in this event the waiting period shall be suspended and shall recommence as of the date the information is furnished.... A filing shall be deemed approved unless disapproved by the Commissioner within the waiting period or any extension thereof."

InforMed urges that the March 1 hearing constituted, in effect, a reconsideration of the December 30 disapproval, and that the SAN proposal, as submitted, was therefore still before the Commissioner. It contends that the only actual requirement for additional information came at that hearing and from Mr. Brandenberg's ensuing letter of March 24, 1993. Mr. Sutton's presentation on March 1 and BCBS's response on March 31, it avers, supplied all of the information required by Mr. Brandenberg. InforMed regards the application for general profile increase as being entirely separate, having no bearing on the SAN proposal. Thus, in its view, the waiting period recommenced at least by March 31, 1993, and, when the Commissioner took no action thereafter, the initial proposal was deemed approved.

The fallacy in InforMed's argument arises from its erroneous supposition that the Commissioner ever reconsidered the initial disapproval. The statute makes clear that a filing shall be deemed approved "unless disapproved by the Commissioner within the waiting period." The SAN proposal *was* disapproved within the waiting period, and that disapproval was never reconsidered or lifted. It is evident from Mr. Sutton's presentation that some loose and inaccurate information had been given to both the physicians and to the Commissioner regarding the proposal, and, having received letters of inquiry or concern from State officials and a number of physicians, the Commissioner agreed merely to hold an informational hearing to clarify the details of the proposal. If

anything is evident from the March 1 hearing, it is that BCBS did not allay all of the concerns expressed in the letter of disapproval. Holding a public informational hearing does not constitute a reconsideration of the disapproval or a resuscitation of the disapproved proposal, and, indeed, neither BCBS nor the Commissioner ever thought otherwise.

Although sometimes blurred when proceedings are conducted informally, reconsideration is necessarily a two-step process. First, the tribunal must decide whether it wishes to reconsider an earlier ruling—whether it is agreeable to placing back before it the issue ruled upon and the merits of the proposal. That is a threshold step, procedural in nature. The second step, which is substantive and can be taken only if the tribunal takes the first step, is to determine whether the previous ruling should be confirmed or altered in some way. The simple answer to InforMed's argument is that the Commissioner never took the first step here.

### Deemed Approved Under § 242B

Section 242B (current § 11–502) was part of subtitle 16 of Article 48A, dealing with rates charged for property, casualty, surety, marine, and title insurance. *See* former Article 48A, §§ 242, 242A. Subtitle 16 did not apply to BCBS, which, as a nonprofit health service plan, was regulated under subtitle 20 of Article 48A, §§ 354 through 361H. *See* § 9(2) of former Article 48A, declaring that the provisions of Article 48A did not apply to nonprofit health service plans "except as otherwise provided in this article." The sections in subtitle 16 provided for the filing of rates and rate schedules by insurers and rating organizations subject to that subtitle and for consideration, approval, and disapproval of those filings by the Insurance Commissioner.

Section 242B dealt with hearings and judicial review. Section 242B(1) concerned hearings and provided, in relevant part, that an insurer or rating organization aggrieved by any order or decision of the Commissioner "under this subtitle" made without a hearing could, within 30 days, request a hearing. Within 20 days after receiving such a request, the

Commissioner was required to conduct a hearing. The hearing was to be concluded within 15 days, and, within 20 days after its conclusion, the Commissioner was directed to affirm, reverse, or modify the previous action. As noted earlier, § 242B(1) went on to provide that, if the Commissioner failed, within the times specified, to hold or complete a hearing or render a decision following a hearing, "the filing or application in issue shall be deemed to meet the requirements of this subtitle and shall be deemed approved."

Section 242B(2) dealt with judicial review. It made all decisions and orders of the Commissioner subject to judicial review "by appeal to the Circuit Court for Baltimore City" and set out some of the procedure governing the action for judicial review. Section 242B, itself, had utterly no application to BCBS or to the approval or disapproval of contracts with health care providers. Subsection (3) made clear that the section applied only to "hearings, orders, and appeals in matters arising under the provisions of this subtitle."

InforMed seeks to avail itself of the "deemed approved" provision in § 242B(1) through § 361B(a) of former Article 48A. That section was part of subtitle 20, dealing with BCBS. It provided that "[a]ll decisions and findings of the Commissioner regarding rates and forms made under § 356 of this subtitle are subject to review by the court in accordance with the provisions of § 242B of this article." InforMed regards this language as incorporating § 242B into subtitle 20 of Article 48A. It did no such thing. It incorporated the *judicial review* provisions of § 242B(2) into subtitle 20, but it made no pretense of incorporating the hearing provisions of § 242B(1) into that subtitle. The only "deemed approved" provision applicable to filings by BCBS was that contained in § 356(a), which we have already concluded was not applicable in this case.

### Summary Judgment Issues

#### (1) *Reasonable Effort To Obtain Approval*

InforMed quite correctly points out that a person "may not rely on illegality or invalidity where the doing of that

said to be forbidden may reasonably be made legal and possible through administrative or judicial action." *McNally v. Moser,* 210 Md. 127, 138, 122 A.2d 555, 561 (1956). That principle is merely another way of saying that, when performance of a contract is conditioned, expressly or by force of law, on the obtaining of some governmental permit or approval, the party required to obtain the permit or approval has an implied obligation to make a reasonable effort to do so. *Allview Acres v. Howard,* 229 Md. 238, 182 A.2d 793 (1962). As we further indicated in *Allview,* "[w]hat will constitute reasonable efforts under a contract expressly or impliedly calling for them is largely a question of fact in each particular case and entails a showing by the party required to make them of 'activity reasonably calculated to obtain the approval by action or expenditure not disproportionate in the circumstances.'" *Id.* at 244, 182 A.2d at 796.

Because the issue is largely a factual one, most of the cases in which it has arisen have reached the appellate courts after a full trial, and, where material facts, or inferences from them, are in dispute, summary judgment would be inappropriate. *See Smith v. Currie,* 40 N.C.App. 739, 253 S.E.2d 645 (N.C.App.1979). Nonetheless, like most other legal issues that are fact-dependent, summary judgment is permissible on this issue if the relevant evidence before the court is not in substantial dispute and allows a conclusion to be drawn as a matter of law. *See Korman v. Kieckhefer,* 114 Ariz. 127, 559 P.2d 683 (1977).

At least two bracketing principles have been established by the cases. On the one hand, failing to file, support, or pursue an application for approval because of a party's belief—even a belief based on advice of counsel—that the application would not likely be approved, has been held insufficient. *See McNally v. Moser, supra,* 210 Md. 127, 122 A.2d 555; *St. Luke's House v. DiGiulian,* 274 Md. 317, 336 A.2d 781 (1975). In *McNally,* the tenant of a unit in a residential property leased for a medical practice attempted to terminate the lease on the ground that, under the zoning law, such a lease was

permissible only if the doctor lived in the property. Although there was some legitimate question of whether that restriction actually applied to the lease in question and it appeared that, even if it did, a special exception or variance may have been possible, the tenant solicited and accepted an oral statement from the building inspector that the lease was impermissible. We found that to be insufficient to establish the illegality defense, holding instead that the tenant, "having brought about the challenge to the use so that he could escape his responsibilities under the lease, could not stand idly by and, because of a notice to that effect from an administrative official, gladly accept as a fact that the use of his office was illegal." *Id.* at 137, 122 A.2d 555. He was under an obligation, on his own or with the landlords' assistance, "to attempt to establish a right to continue that use, or at least to wait until impossibility became a fact, not merely a possibility." *Id.* Citing liberally from *McNally*, we reached a similar conclusion in *St. Luke's House*, where the tenant, upon the advice of its attorney that the lease would violate a restrictive covenant and a zoning ordinance, "relied upon a 'mere possibility' of the illegality of its use and did not fulfill its obligation in establishing, by litigation, the fact of the impossibility of its contemplated use." *Id.* at 329, 336 A.2d 781. *See also Rhodessa Development Co. v. Simpson,* 658 S.W.2d 218 (Tex. Ct.App.1983); *Korman v. Kieckhefer, supra,* 114 Ariz. 127, 559 P.2d 683; *Sechrest v. Safiol,* 383 Mass. 568, 419 N.E.2d 1384 (1981); *Stabile v. McCarthy,* 336 Mass. 399, 145 N.E.2d 821 (1957); *Leonard v. Koval,* 187 Ill.App.3d 924, 135 Ill.Dec. 343, 543 N.E.2d 911 (1989); *Alliance Financial Services v. Cummings,* 526 So.2d 324 (La.Ct.App.1988), holding that failure to make application, support application with needed documentation, or accede to reasonable requests for revisions does not constitute reasonable effort; *but compare Knight v. McCain,* 531 So.2d 590 (Miss.1988) (not necessary to file application for building permit when purchaser told not to do so by permit office because permit would not be issued).

Although "standing idly by" and falling on one's sword does not constitute the requisite reasonable effort, a

party is not required to pursue baseless and expensive litigation or incur extraordinary expense simply to establish reasonableness or good faith. In *Allview Acres, supra,* 229 Md. 238, 182 A.2d 793, a contract of sale was contingent on rezoning, which the seller was obligated to pursue. The seller applied for the rezoning even before the contract was signed, and, when the application was denied by the county commissioners, it sought review of that decision in the circuit court, unsuccessfully. We concluded that those efforts were reasonable and rejected the contention that the seller should have refiled the application after the contract was signed and the suggestion that the effort lacked reasonableness because the seller failed to appeal the judgment of the circuit court. *See also Foodmaker, Inc. v. Denny,* 32 Md.App. 350, 360 A.2d 446 (1976), *cert. denied,* 278 Md. 720 (1976), holding that, when a vigorous effort was made to obtain the necessary administrative approval for a sign permit and a limited time was allowed for obtaining the permit, judicial action was not necessary in order to establish a reasonable effort. Cases from other States are in accord. *See Jamison v. Concepts Plus, Inc.,* 380 Pa.Super. 431, 552 A.2d 265 (1988), (a real estate purchase contract contingent on subdivision approval does not require the buyer to appeal from an adverse administrative decision); *Columbia Christian College v. Cmwlth. Prop., Inc.,* 286 Or. 321, 594 P.2d 401 (1979) (not unreasonable for purchaser to abandon effort to obtain rezoning when evidence showed it would have cost $100,000 and taken six months of research to answer concerns expressed by Planning Commission).

▉ The facts here are essentially undisputed and have been recounted in great detail. BCBS did not sit "idly by." It made application for approval, and for at least three months it pursued that application vigorously. It attempted to inform and persuade the Commissioner's staff in advance, it attended informal meetings with the staff following the formal disapproval, it sought and participated significantly in the informational hearing of March 1, and it continued to supply information afterward. In light of the formal disapproval of the SAN application on December 30, 1992, the questioning of Mr.

Sutton at the hearing on March 1, 1993, the sentiments expressed by Mr. Benton in his April 19, 1993 letter to the Secretary of Personnel, the demand for further information on March 24, 1993, and the rejection of the general profile increase on May 17, 1993, BCBS reasonably came to the conclusion that the Insurance Division "was not about to budge" and that approval of the proposal as submitted and clarified would not be forthcoming. The Insurance Division continued to harbor concern over the need for and method of increasing the physician profiles and the need for InforMed's services.

Given the nature of the concerns expressed by Mr. Brandenberg and his staff, it does not appear likely that an action for judicial review under § 361B would have been successful, and InforMed does not suggest otherwise. It complains, rather, that BCBS failed to insist that the Commissioner render a decision on what it regards as his "agreement to reconsider SAN," that BCBS never argued that the proposal had been "deemed approved" under §§ 242B and 356, and that it never resubmitted its request for general profile increase. We have already answered those complaints. There never was an "agreement to reconsider" the disapproval of the SAN proposal, but only a willingness to gather information in an attempt to sort out what, in fact, was being proposed; BCBS was not obliged to argue that its proposal had been "deemed approved," because there was no legal or factual basis for such an argument; and it is clear that, given the Commissioner's unsatisfied concerns over SAN, resubmission of the request for general profile increase would have been of no assistance. It is evident that the Commissioner objected to the substance and details of the SAN proposal and was not about to approve that proposal. At some point, BCBS simply accepted that reality; there was little else it reasonably could do.

### (2) *Scope of the Summary Judgment*

BCBS's motion for summary judgment did not extend to the entire amended complaint but was limited to the claims based on the disapproved physician compensation increases—those

included in Counts II, IV, VI, VIII, and X. It was those claims to which BCBS interposed the defense of illegality. The amended complaint also included claims for accounting and compensation allegedly due to InforMed itself. They encompassed Counts I, III, V, VII, and IX. The summary judgment entered by the court, however, extended to all counts of the amended complaint, and InforMed complains that the judgment exceeded the scope of the motion.

In *Hartford Ins. Co. v. Manor Inn*, 335 Md. 135, 642 A.2d 219 (1994), we construed Maryland Rule 2–501—the rule governing summary judgments—as not permitting a court to grant summary judgment entirely on its own initiative, where none of the parties moved for that relief. In that case, the plaintiff sued the State and Manor Inn for negligence. The State's alleged negligence was in allowing a patient to elope from a State mental hospital. Manor Inn was sued for leaving a van unattended, thereby allowing the patient to steal it and injure the plaintiff. The State moved for summary judgment against both the plaintiff and Manor Inn; its motion was granted. The court also granted summary judgment in favor of Manor Inn, although no motion for summary judgment had been filed by that defendant. That, we held, was error.

BCBS's motion for partial summary judgment was filed in September, 1995. The first hearing was held on it, by Judge Turnbull, in March, 1996, at which time the motion was denied. Judge Fader held four additional hearings on the issues raised in the motion, spread over a 12–month period. The focus in all of those hearings was on the claims made on behalf of the physicians—those that were the subject of the motion. At the penultimate hearing, conducted on July 1, 1997, the court expressed its inclination to grant summary judgment on the contract claims but had some reservation about the fraud counts. Counsel for InforMed noted that the case was going to be appealed and that "the only way that an appeal can be heard is if there is a final judgment rendered as to all pending matters." No final action was taken at that time on any of the counts.

At the final hearing, on July 14, 1997, the court indicated its intent to grant summary judgment on all of the derivative claims. In reviewing the various counts and perhaps recalling counsel's comment two weeks earlier, Judge Fader indicated his willingness to grant summary judgment on *all* of the counts, so that an immediate appeal could be taken, but only if that was acceptable to InforMed. Counsel for InforMed agreed, procedurally, with that approach, responding that "without acquiescing in the Court's decision and without waiving any of the positions which we have taken in the pleadings, if the Court is of the mind to grant summary judgment, then perhaps the best thing to do is just enter the summary judgment and let us take it up on appeal and we can get some guidance from the appellate court as to some of these very complicated legal issues that the Court has been struggling with and that we have been too." In the absence of any objection from BCBS, it was then that the court granted the judgment, finding "no evidence sufficient . . . to support a breach of contract, unjust enrichment, fraud, or negligent misrepresentation. The affirmative evidence that is required by the Plaintiffs to be presented to survive summary judgment is not there."

In its Brief in this Court, InforMed complains that the court "apparently overlooked the fact that InforMed was not a medical provider and had separate claims for accounting, breach of contract, unjust enrichment, fraud and negligent misrepresentation based on agreements which did not require Insurance Division approval under Article 48A, § 356." It also avers that an affidavit filed by its president in the proceeding raised substantial issues that precluded the entry of summary judgment on those counts.

 Although the court's attention was directed throughout at the derivative claims attacked in the motion for partial summary judgment, and properly so, the court did not, in the end, "overlook" the claims made by InforMed in its own right. As noted, the court's initial inclination was to limit its judgment, in accordance with the motion, to the derivative claims,

and it was only upon InforMed's acquiescence in the court's entering a final judgment on all counts that such a judgment was entered. InforMed very clearly reserved the right to contend that entry of summary judgment on *any* of the counts was substantively in error, but it just as clearly waived its right to complain that the judgments exceeded the scope of the motion. BCBS's decision to raise no objection to that approach may, indeed, be taken as a tacit consent to an enlargement of its motion to cover the non-agency claims. InforMed's procedural complaint is without merit.

The substantive issue, of whether summary judgment was appropriate on the non-derivative claims, is before us. Unfortunately, however, other than making a reference to Mr. Willse's affidavit, InforMed presents no argument as to why summary judgment should not have been entered on those claims. A number of the claims made by InforMed in its own right were parallel to the derivative claims and were worded almost identically, except for the allegation of agency. InforMed makes no argument in its Brief as to how each or any of the non-derivative counts differed from their derivative analogues. Some of them appear almost facially to hinge on whether the increased profiles were lawful. It is not for us to marshal the facts and construct appellant's argument. The evidence shows that BCBS paid the monthly fees called for in the 1993 contract with InforMed—a contract that, on its face, was contingent upon "regulatory approval of the projected adjustments in physician compensation"—until the contract was terminated in July, 1995, and it is not clear to us what independent basis existed for that termination to be regarded as unlawful.

JUDGMENT AFFIRMED;

APPELLANT TO PAY TO PAY THE COSTS.